William M. LEECH, Jr., Attorney General of Tennessee, et al., Appellants,

v.

AMERICAN BOOKSELLERS ASSOCIA-
TION, INC., R. M. Mills Bookstore, Inc.,
Basin Corporation, d/b/a Middle Ten-
nessee News Company: Association of
American Publishers, Inc., National As-
sociation of College Stores, Inc., Tennes-
see Library Association, Appellees.

William M. LEECH, Jr., Attorney General of Tennessee, et al., Appellants,

v.

PLAYHOUSE, INC., and Playgirl,
Inc., Appellees.

Supreme Court of Tennessee.

May 7, 1979.

C. Hayes Cooney, Chief Deputy Atty. Gen., Nashville, Larry E. Parrish, Sp. Asst. to Atty. Gen., Memphis, Peter H. Curry, Director of Law, Donald W. Jones, Metropolitan Atty., Dept. of Law of the Metropolitan Government of Nashville and Davidson County, Nashville, for appellants.

William R. Willis, Jr., Willis & Knight, Alfred H. Knight, III, Willis & Knight, Nashville, Michael A. Bamberger, Finley, Kumble, Wagner, Heine & Underberg, New York City, for appellees in Davidson Chancery.

Kemper B. Durand, Rosenfield, Borod, Bogatin & Kremer, P. C., Kenneth R. Shuttleworth, Frierson M. Graves, Jr., Memphis, for appellees in Shelby Circuit.

## OPINION

FONES, Justice.

These cases challenged the constitutionality of the Tennessee Obscenity Act of 1978 by declaratory judgment actions instituted in the chancery court of Davidson County and the circuit court of Shelby County. The cases present two issues, the facial constitutionality of the Act and the application *vel non* of the doctrine of elision.

The Shelby County trial judge held the Act unconstitutional in its entirety, and the Davidson County chancellor held substantially all of the Act unconstitutional. We declare the entire Act void.

 However, this does not leave Tennessee without a criminal obscenity law. An unconstitutional act that purports to supersede or repeal an existing law is ineffective to do so, since a void law has no force and effect. *State v. Dixon*, 530 S.W.2d 73, 74–75 (Tenn.1975), and cases cited therein. The result is that the prior obscenity law, 1974 Tenn.Pub.Acts, ch. 510, as amended, is in full force and effect.

### I.

As a preface to our consideration of the constitutionality of the Tennessee Obscenity Act of 1978, a brief review of the tortured history of Supreme Court decisions dealing with the "intractable obscenity problem," *Interstate Circuit, Inc. v. City of Dallas*, 390 U.S. 676, 704, 88 S.Ct. 1298, 20 L.Ed.2d 225 (Harlan, J., concurring and dissenting), is in order.

That history begins with the landmark cases of *Roth v. United States* and *Alberts v. California*, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957). Roth conducted a business in New York, the publication and sale of books, photographs and magazines. He was convicted of violating the federal obscenity statute prohibiting the mailing of obscene circulars and advertising of an obscene book.

Alberts conducted a mail order business from Los Angeles. He was convicted of violating a section of the California Penal Code prohibiting the keeping for sale of obscene and indecent books and with writing, composing and publishing an obscene advertisement of them.

The first issue the Court dealt with was whether obscenity is utterance within the area of protected speech and press, noting that this was the first time the question had been squarely presented under the first or fourteenth amendments, although the Court hastened to add that expressions could be found in numerous opinions indicating that it always had been assumed that obscenity was not protected by the first amendment.

In addressing this first issue the majority recognized that it had to deal with the fact that the first amendment is written in absolute terms:

"Congress shall make no law . . . abridging the freedom of speech, or of the press . . .."

Mr. Justice Brennan, writing for the majority, dealt with this problem by noting that in 1792, when ten of the fourteen states had ratified the Constitution, statutes in effect in those states gave no absolute protection for "every utterance":

"Thirteen of the 14 States provided for the prosecution of libel, and all of those States made either blasphemy or profanity, or both, statutory crimes. As early as 1712, Massachusetts made it criminal to publish 'any filthy, obscene, or profane song, pamphlet, libel or mock sermon' in imitation or mimicking of religious services. (Citations omitted.)" 354 U.S. at 482–483, 77 S.Ct. at 1307.

The conclusion was then reached that in the light of this history it was apparent that the unconditional phrasing of the first amendment was not intended to protect every utterance. The majority noted that the absolute phrasing of the first amendment did not prevent the Court from concluding that libelous utterances were not constitutionally protected, citing *Beauharnais v. Illinois,* 343 U.S. 250, 72 S.Ct. 725, 96 L.Ed. 919 (1952).

The majority summarized the scope of the protection given speech and press in this way:

"All ideas having even the slightest redeeming social importance—unorthodox ideas, controversial ideas, even ideas hateful to the prevailing climate of opinion—have the full protection of the guaranties, unless excludable because they encroach upon the limited area of more important interests. But implicit in the history of the First Amendment is the rejection of obscenity as *utterly without redeeming social importance.*" (Emphasis added.) 354 U.S. at 484, 77 S.Ct. at 1309.

The Court rejected the *Hicklin* test, which allowed material to be judged by the effect of an isolated excerpt upon particularly susceptible people and substituted in its place the following standard: "whether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest." 354 U.S. at 489, 77 S.Ct. at 1311.

The Court approved jury instructions in the *Roth* case that contained the following:

" 'In other words, you determine its impact upon the average person in the community. . . . You judge the circulars, pictures and publications which have been put in evidence by present-day standards of the community. You may ask yourselves does it offend the common conscience of the community by present-day standards.'

[Y]ou alone are the exclusive judges of what the common conscience of the community is, and in determining that con-

science you are to consider the community as a whole, young and old, educated and uneducated, the religious and the irreligious–men, women and children." 354 U.S. at 490, 77 S.Ct. at 1312.

Chief Justice Warren concurred in the results reached by the majority but expressed reservations because the broad language used might eventually be applied to the arts and sciences and freedom of communication generally, and he was of the opinion that the decisions in *Roth* and *Alberts* should be limited to the facts involved in those cases.

Mr. Justice Harlan concurred in *Alberts* but dissented in *Roth*. Dissenting in *Roth*, Mr. Justice Harlan said:

"I cannot agree that any book which tends to stir sexual impulses and lead to sexually impure thoughts necessarily is 'utterly without redeeming social importance.' Not only did this charge fail to measure up to the standards which I understand the Court to approve, but as far as I can see, much of the great literature of the world could lead to conviction under such a view of the statute. Moreover, in no event do I think that the limited federal interest in this area can extend to mere 'thoughts.' The Federal Government has no business, whether under the postal or commerce power, to bar the sale of books because they might lead to any kind of 'thoughts.'

It is no answer to say, as the Court does, that obscenity is not protected speech. The point is that this statute, as here construed, defines obscenity so widely that it encompasses matters which might very well be protected speech. I do not think that the federal statute can be constitutionally construed to reach other than what the Government has termed as 'hard-core' pornography." 354 U.S. at 507, 77 S.Ct. at 1320.

Mr. Justice Douglas wrote a dissenting opinion, in which Mr. Justice Black concurred. Mr. Justice Douglas was particularly critical of the standard of judging obscenity on the basis of whether or not it offends the common conscience of the com-

munity, during the course of which he made these observations:

"If experience in this field teaches anything, it is that 'censorship of obscenity has almost always been both irrational and indiscriminate.'

. . . . .

The legality of a publication in this country should never be allowed to turn either on the purity of thought which it instills in the mind of the reader or on the degree to which it offends the community conscience. By either test the role of the censor is exalted, and society's values in literary freedom are sacrificed.

. . . . .

For the test that suppresses a cheap tract today can suppress a literary gem tomorrow." 354 U.S. at 512–14, 77 S.Ct. at 1324.

The next significant obscenity case decided by the Supreme Court was *Kingsley Int'l Pictures Corp. v. Regents of N. Y. U.,* 360 U.S. 684, 79 S.Ct. 1362, 3 L.Ed.2d 1512 (1959). The issue in the case was whether or not a license to show the motion picture "Lady Chatterley's Lover" could be denied under a New York statute authorizing the issuance of licenses for motion pictures "unless such film or a part thereof is obscene, indecent, immoral, . . . ." The Court of Appeals of New York held that the Regents could validly deny the license to show "Lady Chatterley's Lover," finding the motion picture to be within the proscription of the statute " 'because its subject matter is adultery presented as being right and desirable for certain people under certain circumstances.' " *Id.* at 687, 79 S.Ct. at 1365, *quoting from* 4 N.Y.2d 349, 369, 175 N.Y. S.2d 39, 55, 151 N.E.2d 197, 208 (1958) (concurring opinion). The Supreme Court held that the action denied the exhibitor's rights under the first amendment. Mr. Justice Stewart, writing for the majority, said:

"What New York has done, therefore, is to prevent the exhibition of a motion picture because that picture advocates an idea—that adultery under certain circumstances may be proper behavior. Yet the First Amendment's basic guarantee is of freedom to advocate ideas. The State, quite simply, has thus struck at the very heart of constitutionally protected liberty." 360 U.S. at 688, 79 S.Ct. at 1365.

It is perhaps significant to note that in this rather uncomplicated obscenity case there were six separate opinions. Justices Douglas and Black shared the view that prior censorship of motion pictures like prior censorship of newspapers and books violates the first and fourteenth amendments.

Mr. Justice Frankfurter wrote a separate opinion in which these significant observations were made:

"In short, there is an evil against which a State may constitutionally protect itself, whatever we may think about the questions of policy involved. The real problem is the formulation of constitutionally allowable safeguards which society may take against evil without impinging upon the necessary dependence of a free society upon the fullest scope of free expression. One cannot read the debates in the House of Commons and the House of Lords and not realize the difficulty of reconciling these conflicting interests, in the framing of legislation on the ends of which there was agreement, even for those who most generously espouse that freedom of expression without which all freedom gradually withers.

It is not our province to meet these recalcitrant problems of legislative drafting. Ours is the vital but very limited task of scrutinizing the work of the draftsmen in order to determine whether they have kept within the narrow limits of the kind of censorship which even D. H. Lawrence deemed necessary. *The legislation must not be so vague, the language so loose, as to leave to those who have to apply it too wide a discretion for sweeping within its condemnation what is permissible expression as well as what society may permissibly prohibit.*" (Emphasis added.) 360 U.S. at 694–95, 79 S.Ct. at 1368.

On June 22, 1964, the Supreme Court decided two obscenity cases, *A Quantity of*

*Copies of Books v. Kansas,* 378 U.S. 205, 84 S.Ct. 1723, 12 L.Ed.2d 809 (1964), and *Jacobellis v. Ohio,* 378 U.S. 184, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1964). *Jacobellis* involved a conviction for possession and exhibition of an allegedly obscene film, called "Les Amants" ("The Lovers"). Mr. Justice Brennan, writing the plurality opinion, said that the dispositive question was whether the state courts properly had found that the film was obscene and therefore not entitled to first and fourteenth amendment protection. The opinion renewed the *Roth* test, with some additional comments, and found that the motion picture was not obscene when tested by that standard. Mr. Justice Brennan conceded that the *Roth* test was not perfect but that any substitute would raise equally difficult problems. The following from the plurality opinion is significant to our inquiry:

> "We would reiterate, however, our recognition in *Roth* that obscenity is excluded from the constitutional protection only because it is 'utterly without redeeming social importance,' and that '[t]he portrayal of sex, e. g., in art, literature and scientific works, is not itself sufficient reason to deny material the constitutional protection of freedom of speech and press.' Id., 354 U.S., at 484, 487, 77 S.Ct., at 1310. It follows that material dealing with sex in a manner that advocates ideas, *Kingsley Int'l Pictures Corp. v. Regents,* 360 U.S. 684, 79 S.Ct. 1362, 3 L.Ed.2d 1512, or that has literary or scientific or artistic value or any other form of social importance, may not be branded as obscenity and denied the constitutional protection. Nor may the constitutional status of the material be made to turn on a 'weighing' of its social importance against its prurient appeal, for a work cannot be proscribed unless it is 'utterly' without social importance. (citations omitted). It should also be recognized that the *Roth* standard requires in the first instance a finding that the material 'goes substantially beyond customary limits of candor in description or representation of such matters.' " 378 U.S. at 191, 84 S.Ct. at 1680.

Later in the plurality opinion, Mr. Justice Brennan said this:

> "The Court has explicitly refused to tolerate a result whereby 'the constitutional limits of free expression in the Nation would vary with state lines,' *Pennekamp v. Florida,* supra, 328 U.S. 331, at 335, 66 S.Ct. 1029, at 1031, 90 L.Ed. 1295, we see even less justification for allowing such limits to vary with town or county lines. We thus reaffirm the position taken in *Roth* to the effect that the constitutional status of an allegedly obscene work must be determined on the basis of a national standard. It is, after all, a national Constitution we are expounding.

> We recognize the legitimate and indeed exigent interest of States and localities throughout the Nation in preventing the dissemination of material deemed harmful to children. But that interest does not justify a total suppression of such material, the effect of which would be to 'reduce the adult population . . . to reading only what is fit for children.' *Butler v. Michigan,* 352 U.S. 380, 383, 77 S.Ct. 524, 526, 1 L.Ed.2d 412. State and local authorities might well consider whether their objectives in this area would be better served by laws aimed specifically at preventing distribution of objectionable material to children, rather than at totally prohibiting its dissemination." *Id.* at 194–95, 84 S.Ct. at 1682.

Justices Brennan, White, Goldberg and Stewart viewed the film, in the light of the record made in the trial court, and found it not to be obscene tested by the *Roth* standards. Justices Black and Douglas, following their previously announced policy that they would not engage in censorship, did not view the film, but concurred in the reversal.

The concurrence of Justices Black and Douglas was predicated on their consistent position that the first amendment freedom of speech and press is absolute and extends to the exhibition of a motion picture.

In a separate concurring opinion, Mr. Justice Stewart said that he interpreted *Roth*

and *Alberts* to mean that under the first and fourteenth amendments, criminal laws in this area were constitutionally limited to hardcore pornography. Mr. Justice Stewart then continued with his oft-quoted observation that:

"I shall not today attempt further to define the kinds of material I understand to be embraced within that shorthand description; and perhaps I could never succeed in intelligibly doing so. But I know it when I see it, and the motion picture involved in this case is not that." *Id.* at 197, 84 S.Ct. at 1683.

Chief Justice Warren wrote a dissenting opinion, in which Mr. Justice Clark joined. Their dissent expressed the following view: The reference to community standards in *Roth* did not refer to a national standard; the fact that a community approach may well result in material being found obscene in one community and not in another does not require a national standard.

On March 21, 1966, the Supreme Court decided three obscenity cases, writing fourteen separate opinions. *A Book Named "John Cleland's Memoirs of a Woman of Pleasure" v. Attorney General of the Commonwealth of Massachusetts,* 383 U.S. 413, 86 S.Ct. 975, 16 L.Ed.2d 1 (1966) (*Memoirs v. Massachusetts*); *Ginzburg v. United States,* 383 U.S. 463, 86 S.Ct. 969, 16 L.Ed.2d 31 (1966); and *Mishkin v. New York,* 383 U.S. 502, 86 S.Ct. 958, 16 L.Ed.2d 56 (1966).

The plurality opinion in *Memoirs* was written by Mr. Justice Brennan, joined by Chief Justice Warren and Mr. Justice Fortas. *Memoirs* was a civil equity suit brought by the Attorney General of Massachusetts directed against the book commonly known as "Fannie Hill." The Supreme Judicial Court of Massachusetts purported to apply the three elements of the *Roth* definition of obscenity and reached the conclusion that all three were satisfied. However, in discussing the "social value" criterion the court said that the fact that the testimony indicated the book had some minimal literary value did not mean that it was of any social importance. The Massachu-

setts court said that it did not interpret the social value test as necessitating a finding that the material "must be unqualifiedly worthless" before it could be held obscene.

The Supreme Court's plurality said that each of the three federal constitutional criteria must be applied independently and that the Massachusetts court had placed an erroneous interpretation upon the "utterly without redeeming social value" element, having declared the work obscene in the face of a finding that it possessed a modicum of social value.

In the years between *Memoirs* and *Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), the Supreme Court followed a practice of summarily reversing obscenity convictions when five members of the Court, applying their separate tests, found the work to be protected by the first amendment. This procedure was known as the *Redrup* policy, and thirty-one cases were decided in that manner. *See Miller, supra* at 22 n. 3, 93 S.Ct. 2607. The footnote concludes with this statement:

"The *Redrup* (*Redrup v. New York,* 386 U.S. 767, 87 S.Ct. 1414, 18 L.Ed.2d 515) procedure has cast us in the role of an unreviewable board of censorship for the 50 States, subjectively judging each piece of material brought before us." 413 U.S. at 22 n. 3, 93 S.Ct. at 2614 n. 3.

In *Miller,* the majority opinion, written by Chief Justice Burger, announced that the Court was undertaking the task of formulating "standards more concrete than those in the past" implicitly to terminate the unacceptable "*Redrup* procedure." Drawing upon the principles in *Roth* and *Memoirs,* the Court enunciated three specific standards that departed from those decisions in two respects: (1) the serious literary, artistic, political, or scientific value test was substituted for the "utterly without redeeming social value" test of *Memoirs* and (2) the "contemporary community standards" test was substituted for *Roth's* national standard test.

The *Miller* Court made it clear that the three standards are separate and independent issues that must be answered, in the

affirmative, by the trier of fact, judge or jury, to support a finding that materials are obscene and unprotected by the first amendment. The standards are:

"(a) whether 'the average person, applying contemporary community standards' would find that the work, taken as a whole, appeals to the prurient interest, (citations omitted); (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value." 413 U.S. at 24, 93 S.Ct. at 2615.

The *Miller* majority evaluated its accomplishments in dealing with the on-going obscenity problem in this way:

"Under the holdings announced today, no one will be subject to prosecution for the sale or exposure of obscene materials unless these materials depict or describe patently offensive 'hard core' sexual conduct specifically defined by the regulating state law, as written or construed. We are satisfied that these specific prerequisites will provide fair notice to a dealer in such materials that his public and commercial activities may bring prosecution." 413 U.S. at 27, 93 S.Ct. at 2616.

The most significant cases since *Miller* are *Hamling v. United States,* 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974); *Smith v. United States,* 431 U.S. 291, 97 S.Ct. 1756, 52 L.Ed.2d 324 (1977), and *Pinkus v. United States,* 436 U.S. 293, 98 S.Ct. 1808, 56 L.Ed.2d 293 (1978). These cases affirm the three standards of *Miller,* adding some clarification that will be alluded to in discussing specific sections of the Tennessee Act.

In short, the United States Supreme Court has struggled almost continuously for the past twenty-two years with the problem of establishing and refining a definition of obscene material, which is beyond the protection of the first and fourteenth amendments and therefore subject to regulation and criminalization by the states. On June 21, 1973, a five-judge majority in *Miller* agreed upon a three-pronged test, which

has survived the assaults levied in subsequent obscenity cases, by the same narrow margin. That basic three-prong test has been refined, by definition and explanation of some of the phrases therein, in *Hamling, Smith* and *Pinkus* in a continuing attempt to clarify the boundary line between protected speech and press and unprotected obscene material.

Mr. Justice Douglas, dissenting in *Miller,* said of the three-prong test: "Those are the standards we ourselves have written into the Constitution." 413 U.S. at 39, 93 S.Ct. at 2623.

Although said in dissent, that was, and remains, an incontestable statement that now embraces the pronouncements in *Hamling, Smith* and *Pinkus.* It follows that any definition that is at variance with, or in any way expands, the meaning of obscene material, as it "has been written into the Constitution" by the Supreme Court, is constitutionally impermissible.

■ This Court is of the opinion that the Tennessee constitutional provision assuring protection of speech and press, Tenn.Const. art. I, § 19, should be construed to have a scope at least as broad as that afforded those freedoms by the first amendment of the United States Constitution.

■ It is settled constitutional law that state supreme courts may not restrict the protection afforded by the federal constitution, as interpreted by the United States Supreme Court, but they may expand constitutional protections, even where the state and federal constitutions contain similar or identical provisions.

Thus, this Court may interpret Article I, § 19, as granting absolute protection to speech and press and forbid any and all regulation of pornography in Tennessee. We have no inclination to do so. On the other hand, we cannot encroach one step farther than the United States Supreme Court in restricting speech and press, and therefore cannot give constitutional approval to any law expanding the standards for adjudicating obscenity, *vel non,* beyond the dictates of *Miller* and its progeny.

In addition to first amendment issues, the problem of vagueness pervades the Tennessee Act.

■ A criminal statute that forbids the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law. U.S.Const. amend. XIV; Tenn.Const. art. I, § 8.

In *Winters v. New York,* 333 U.S. 507, 68 S.Ct. 665, 92 L.Ed. 840 (1948), the Court, speaking through Mr. Justice Reed,° said:

> "It is settled that a statute so vague and indefinite, in form and as interpreted, as to permit within the scope of its language the punishment of incidents fairly within the protection of the guarantee of free speech is void, on its face, as contrary to the Fourteenth Amendment. *Stromberg v. People of State of California,* 283 U.S. 359, 369, 51 S.Ct. 532, 535, 75 L.Ed. 1117, 73 A.L.R. 1484; *Herndon v. Lowry,* 301 U.S. 242, 258, 57 S.Ct. 732, 739, 81 L.Ed. 1066. A failure of a statute limiting freedom of expression to give fair notice of what acts will be punished and such a statute's inclusion of prohibitions against expressions, protected by the principles of the First Amendment violates an accused's rights under procedural due process and freedom of speech or press." 333 U.S. at 509–10, 68 S.Ct. at 667.

Mr. Justice Black, concurring and dissenting in *Barenblatt v. United States,* 360 U.S. 109, 79 S.Ct. 1081, 3 L.Ed.2d 1115 (1959), focused on the vagueness problem in a criminal statute in these words:

> "It goes without saying that a law to be valid must be clear enough to make its commands understandable. For obvious reasons, the standard of certainty required in criminal statutes is more exacting than in noncriminal statutes. This is simply because it would be unthinkable to convict a man for violating a law he could not understand. This Court has recognized that the stricter standard is as much required in criminal contempt cases as in all other criminal cases, and has emphasized that the 'vice of vagueness' is

especially pernicious where legislative power over an area involving speech, press, petition and assembly is involved." (Citations omitted.) 360 U.S. at 137, 79 S.Ct. at 1099.

The Tennessee cases of *Underwood v. State,* 529 S.W.2d 45 (Tenn.1975), and *Estrin v. Moss,* 221 Tenn. 657, 430 S.W.2d 345 (1968), adhere to the principle that a statute so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application must be declared void for vagueness.

## II.

■ The definition of obscene material in the Tennessee Act begins with the three basic guidelines laid down by the Supreme Court in *Miller.* T.C.A. § 39–3002(c). In subsequent subsections, words and phrases are lifted out of these guidelines and defined. The phrases (1) "average person," (2) "contemporary community standards," (3) "taken as a whole," (4) "appeals to," (5) "prurient interest," (6) "sexual conduct depicted in a patently offensive way," and the words (7) "unwholesome" and (8) "value" are defined with the result that the Tennessee definition of obscene materials expands the *Miller* guidelines by eight lengthy and unique definitions of terms found therein. T.C.A. § 39–3002(e), (f), (g), (h), (i), (j), (k) and (*l*).

## A.

T.C.A. § 39–3002(e) provides:

> "The phrase 'average person' means a hypothetical human being whose attitude represents a synthesis and composite of all of the various attitudes of all individuals, irrespective of age, in Tennessee society at large, which attitude is the result of human experience, understanding, development, culturalization, and socialization in Tennessee, taking into account relevant factors which affect and contribute to that attitude, limited to that which is personally acceptable, as opposed to, that which might merely be tolerated."

Since *Miller,* the Supreme Court has rather explicitly explained the scope and meaning of the term "average person."

In *Hamling v. United States, supra,* the Court said:

"A juror is entitled to draw on his own knowledge of the views of the average person in the community or vicinage from which he comes for making the required determination, just as he is entitled to draw on his knowledge of the propensities of a 'reasonable' person in other areas of the law."

. . . . .

"This Court has emphasized on more than one occasion that a principal concern in requiring that a judgment be made on the basis of 'contemporary community standards' is to assure that the material is judged neither on the basis of each juror's personal opinion, nor by its effect on a particularly sensitive or insensitive person or group." 418 U.S. at 104–05, 107, 94 S.Ct. at 2091.

In *Pinkus v. United States, supra,* one of the issues dealt with was the alleged error of the trial court in giving the following charge:

" 'Thus the brochures, magazines and film are not to be judged on the basis of your personal opinion. Nor are they to be judged by their effect on a particularly *sensitive or insensitive* person or group in the community. You are to judge these materials by the standard of the hypothetical average person in the community, but in determining this average standard you must include the *sensitive and the insensitive,* in other words, you must include everyone in the community.' (Emphasis added.)" 436 U.S. at 298–99, 98 S.Ct. at 1812.

In developing the theme that obscenity is to be judged according to the average person in the community, rather than the most prudish or the most tolerant, the Court said:

"[T]he community includes all adults who constitute it, and a jury can consider them all in determining relevant community standards.

. . . . .

But the term 'average person' as used in this charge means what it usually means, and is no less clear than 'reasonable person' used for generations in other contexts. (Citations omitted.) Cautionary instructions to avoid subjective personal and private views in determining community standards can do no more than tell the individual juror that in evaluating the hypothetical 'average person' he is to determine the collective view of the community, as best as it can be done." 436 U.S. at 300–01, 98 S.Ct. at 1813.

The Tennessee Legislature has attempted to do far more through its definition of the "average person" than to say that he represents the collective view of the adult community.

First, the definition is not limited to adults, as it expressly includes "all individuals, irrespective of age."

Again, in *Pinkus* the Court said:

"[W]e elect to take this occasion to make clear that children are not to be included for these purposes as part of the 'community' as that term relates to the 'obscene materials' . . .." 436 U.S. at 297, 98 S.Ct. at 1812.

The rationale for so holding was that it would tend to reduce the adult population to reacting to only what is fit for children, and the standard for judging obscenity *vel non* would reach a much lower "average" when children are part of the equation. *Pinkus v. United States, supra,* at 298, 98 S.Ct. 1808.

That portion of the definition is thus unconstitutionally restrictive of the freedom of speech and press, in all cases in which the intended recipients of the obscene materials at issue are adults. Tenn.Const. art. I, § 19; U.S.Const. amends. I, XIV.

Next, the definition limits the average person to one whose attitude *is the result of* "experience, understanding, development, culturalization [sic] and socialization *in Tennessee."* (Emphasis added.) That definition would require the trier of fact to separate the "human experience, understanding,

development," etc., of the hypothetical average person occurring "in Tennessee" from those influences derived from sources outside Tennessee. Tennesseans do not live in isolation from the remainder of the world, even if they do not travel beyond state boundaries. Most, if not all, Tennessee communities and vicinages have adults residing therein (1) who were educated in our sister states or foreign lands, (2) who have traveled extensively and acquired foreign culture, or (3) who were born, developed, cultured and socialized in other states and foreign lands. But, the definition would require screening out those "foreign" influences, taking into consideration only that portion of their attitudes that resulted from experience, etc., in Tennessee.

While the *Miller* standards, as elaborated in *Hamling, Smith* and *Pinkus* permit limitation of community standards to the collective view of those adults residing in the state or vicinage, at the time of the alleged offense ("contemporary"), it is patently impermissible to attempt to localize the sources of stimuli, experience, etc., that contribute to one's "attitude." Obviously, as in the case of including children, the exclusion of all non-Tennessee influences on "attitude" would tend to reach a much lower "average" than if such a restriction was omitted and thus presents another constitutional infirmity.

Finally, the attitude of the hypothetical average person in Tennessee would be limited to that which is *personally acceptable,* totally rejecting that which might be *tolerated.* In applying both the (a) prurient interest and (b) patently offensive tests of *Miller,* the trier of fact must discard tolerance and judge a work solely on acceptance. Among the shades of meaning of the noun "acceptance" are "approval," "favorable reception," "agreement" and "assent." The American Heritage Dictionary 7 (1969). The noun "tolerance" means "1. The capacity for or practice of allowing or respecting the nature, beliefs, or behavior of others. 2.a. Leeway for variation from a standard." *Id.* at 1351.

In the course of discussing the prurient interest and patently offensive tests in *Smith v. United States, supra,* the Court said:

> "[C]ontemporary community standards must be applied by juries in accordance with their own understanding of the *tolerance* of the average person in their community . . . ." (Emphasis added.) 431 U.S. at 305, 97 S.Ct. at 1766.

It is obvious that the acceptance test would lead to the indiscriminate branding as obscene much of protected speech that would otherwise pass the tolerance test. As we have heretofore noted, we cannot encroach further upon the freedom of speech and press than the *Miller* standards permit, as a matter of federal constitutional law. Independent of the United States Constitution, the three infirmities that adhere in the Act's definition of "average person" violate Article I, § 19, Tenn.Const., as impermissible encroachments on the freedom of speech and press.

### B.

T.C.A. § 39–3002(f) states as follows:

> "In the phrase 'contemporary community standards,' the word 'contemporary' means what was prevailing at the time of the offense charged; the words 'community standards' mean a belief or course of conduct relative to open general adult public exhibition and open general adult public dissemination among Tennessee citizens of portrayals, representations, descriptions, depictions, and live performances of sexual conduct deemed proper and appropriate and which is accepted in Tennessee society at large encompassing people in general existing in community with one another having interests common to humanity without regard to place of residence in this state."

This subdefinition would require the trier of fact to judge the material on the basis of that which is *deemed proper, appropriate and acceptable* in Tennessee society. For the reasons discussed in section II–A of this opinion, this subsection violates Tenn.Const. art. I, § 19 and U.S.Const. amends. I, XIV.

### C.

■ T.C.A. § 39–3002(g) defines as follows:

"'Taken as a whole' means considered as a single unit which is logically and structurally identifiable as a whole by or because of the sameness or commonality in its subject, or its theme, or its plot and plot development, or its story, or its message, or its ideas, or its thoughts, or its depiction, or its portrayal, provided: bound volumes, including but not limited to magazines or other periodicals, which contain miscellaneous articles, stories, poems, or other writings, illustrations, and photographic depictions, with each piece or portrayal standing on its own merit and having no content interdependence with other pieces bound together to make a single volume, may not be considered as a whole unless there is such interdependence of, between, or among the separate pieces that to remove any one of them materially would change the type, as opposed to the quality, of the volume as a magazine, periodical, or other publication or communicative medium; otherwise, each separate piece or pictorial or combination of them shall be separately taken as a whole."

In *Kois v. Wisconsin,* 408 U.S. 229, 92 S.Ct. 2245, 33 L.Ed.2d 312 (1972), the issue was whether two photographs found to be obscene under a state statute were entitled to first and fourteenth amendment protection because they accompanied a newspaper article that clearly was entitled to freedom of speech and press immunity. The twofold test applied by the Court was (1) whether the photographs were "rationally related" to the article and (2) whether the article was "a mere vehicle for the publication" of the pictures. The second test was aptly illustrated by the following observation: "A quotation from Voltaire in the flyleaf of a book will not constitutionally redeem an otherwise obscene publication . . . ." *Id.* at 231, 92 S.Ct. at 2246.

The "bound volume" portion of the definition replaces the "rationally related" test with a requirement that any "separate piece" must have "such interdependence" that if removed, it would materially change "the type, as opposed to the quality" of the work, otherwise each separate piece "shall be separately taken as a whole."

It is obvious that, in the case of most, if not all, newspapers, all other periodicals and all books except those developing a single plot are composed of "separate pieces" so lacking in interdependence that any "single unit" may be removed without materially changing the "type" of the publication. The result is that the Tennessee Act's definition gives carte blanche authorization to "separately take[n] as a whole" a single picture or a "separate piece" of writing, and if standing alone it is obscene, then the trier of fact may condemn the entire bound volume, without applying the test of rational relationship of alleged obscene material to constitutionally protected speech and press.

The definition in T.C.A. § 39–3002 is in direct conflict with the "taken as a whole" concept, mandated in two of the *Miller* tests, an encroachment on the freedom of speech and press and is unconstitutional under Article I, § 19 of the Constitution of Tennessee and also impermissible under the first and fourteenth amendments of the federal constitution.

### D.

■ T.C.A. § 39–3002(i) defines "prurient interest" as follows:

"The phrase 'prurient interest' means that quality inherent in all human beings which when aroused evokes feelings of shame, embarrassment, disgust, or revulsion or evidences mental, emotional or physical pathology, or is degrading in that it elicits unwholesome lusts, cravings, or longings."

In *Roth v. United States, supra,* the Court said:

"However, sex and obscenity are not synonymous. Obscene material is material which deals with sex in a manner appealing to prurient interest." 354 U.S. at 487, 77 S.Ct. at 1310.

Footnote twenty is quite lengthy, but the Court concluded by, in effect, approving the A.L.I. Model Penal Code definition of "obscenity," which includes the definition of "prurient interest."

" '[A] thing is obscene, if, considered as a whole, its predominant appeal is to prurient interest, i. e., a shameful or morbid interest in nudity, sex, or excretion, and if it goes substantially beyond customary limits of candor in description or representation of such matters. . . .' " 354 U.S. at 487 n. 20, 77 S.Ct. at 1310 n. 20 *quoting* A.L.I. Model Penal Code, § 207.10(2) (Tent.Draft No. 6, 1957).

In *Miller,* the Court said:

"[W]e now confine the permissible scope of such regulation to works which depict or describe sexual conduct. . . . A state offense must also be limited to works which, taken as a whole, appeal to the prurient interest in sex, . . . ." 413 U.S. at 24, 93 S.Ct. at 2614.

The quotation above from *Roth,* ending with footnote twenty, was immediately followed by these comments by the Court:

"The portrayal of sex *e. g.,* in art, literature and scientific works, is not itself sufficient reason to deny material the constitutional protection of freedom of speech and press. Sex, a great and mysterious motive force in human life, has indisputably been a subject of absorbing interest to mankind through the ages; it is one of the vital problems of human interest and public concern." 354 U.S. at 487, 77 S.Ct. at 1310.

Thus, it is clear that the boundary line between portrayals of sex protected by the first amendment and unprotected obscene material is marked by the presence of "appeal to the prurient interest in sex," which, in turn, is "a shameful or morbid interest in nudity, sex or excretion." Any state definition of "prurient interest" at variance with or broader than the language of *Roth* and *Miller* is constitutionally infirm.

As Chancellor Brandt pointed out in his well-reasoned opinion, the Tennessee Act contains a three-pronged definition that "encompasses qualities and characteristics which exceed the concept of prurient interest as that term has been defined by the Supreme Court." The definition assumes that all human beings have that inherent "quality" which when aroused evokes feelings that fall into one or more of three categories: (1) shame, embarrassment, disgust or revulsion, or (2) mental, emotional or physical pathology or (3) degrading because it elicits unwholesome lusts, cravings, or longings. By failing to include the essential element that the interest appealed to and aroused must be sex, the definition is overbroad and constitutionally infirm.

■ Also, as noted by Chancellor Brandt, the third category of aroused feelings would pass constitutional muster, if read alone and if limited to sex stimuli), and if the word "unwholesome" had not been vaguely and unintelligibly subdefined in T.C.A. § 39–3002(j). Subsection (j) defines "unwholesome" as:

"The word 'unwholesome' means that which, if continued, would present an obstacle or impairment to culturalization according to prevailing norms and mores in society, including, but not limited to, the removal of feelings of guilt in contravention of cultural teachings that guilt is the normal feeling providing inhibition which discourages similar performances under like circumstances."

The most serious vagueness problem with that definition is that it is circumscribed by adherence to the "prevailing norms and mores in society." Norms and mores are not subdefined, surprisingly, and it is generally true that every individual tends to regard his own views and behavior to be consistent with, and representative of, the norms and mores of society. A trier of fact in an obscenity case could, therefore, be expected to replace the "collective view of the community" with his conception of the "norms and mores in society" in determining whether material appeals to the prurient interest. In addition, "in society" is geographically vague and ambiguous, suggesting to some national, or even international dimensions, but to others a more restricted circle.

In *Baggett v. Bullitt,* 377 U.S. 360, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964), the Supreme Court invalidated a loyalty oath on the ground of vagueness. Therein the Court said:

"The oath exacts a promise that the affiant will, . . . promote respect for the flag and the institutions of the United States and the State of Washington. . . . [W]hat are 'institutions' for the purposes of this oath? Is it every 'practice, law, custom, etc., which is a material and persistent element in the life or culture of an organized social group' . . ? The oath may prevent a professor from criticizing his state judicial system or the Supreme Court or the institution of judicial review. Or it might be deemed to proscribe advocating the abolition, for example, of the Civil Rights Commission, the House Committee on Un-American Activities, or foreign aid." 377 U.S. at 371, 84 S.Ct. at 1322.

We are of the opinion that the "norms and mores" in society are less ascertainable and identifiable than the "institutions" of the United States and the State of Washington. For the reasons stated, the definition of "unwholesome" is void under the state and federal constitutions.

### E.

■ T.C.A. § 39–3002(*l*) provides this definition:

" 'Sexual conduct depicted in a patently offensive way' means:

(1) Clearly visible or detailed written portrayal, representation, description, depiction, or live performance, irrespective of the actual visibility of the external or internal genitalia or pubic region, of human vaginal or anal sexual intercourse; fellatio; cunnilingus; analingus; oral or genital contact as a part of human male or female homosexual acts; manual or digital insertion into or fondling of the external or internal genitalia or pubic region, anus or rectal cavity; oral contact with the areola or nipple of female breasts as a part of or preparatory to other sexual activity here described; co-

prophilia; urolagnia; masturbation; pedophilia; necrophilia; bestiality; sadistic sexual excitement; masochistic sexual excitement; sexual excitement by use of bondage or masks; or

(2) Clearly visible portrayal, representation, depiction or live performance which focuses on and tends to concentrate the attention of a viewer on the human external or internal genitalia, anus, rectal cavity, or the pubic region designed, irrespective of success in so doing, so as to stimulate unwholesome lustful thoughts, cravings, or desires."

In *Miller,* the Court gave two express examples of how a state could define and proscribe portrayals of sex acts:

"(a) Patently offensive representations or descriptions of ultimate sexual acts, normal or perverted, actual or simulated.

(b) Patently offensive representations or descriptions of masturbation, excretory functions, and lewd exhibition of the genitals." 413 U.S. at 25, 93 S.Ct. at 2615.

The problem with the Tennessee Act's definition is that it clearly means that a detailed description of sex, in any context, is per se "patently offensive." The result of that definition would be to eliminate from consideration by the trier of fact the issue of whether or not a description or portrayal, etc., of sex was or was not "patently offensive." Thus, the definition nullifies the second prong of the *Miller* test. The *Roth* Court made it clear that the portrayal of sex in art, literature and scientific works is not, in and of itself, sufficient reason to deny first amendment protection to such material. 354 U.S. at 487, 77 S.Ct. 1304.

The definition of "patently offensive" is in direct conflict with *Roth* and *Miller,* encroaches upon federal and state freedom of speech and press guarantees and is constitutionally infirm.

### F.

■ Subsection (k) of T.C.A. § 39–3002 defines "value" as follows:

" 'Value' means that quality which makes a thing an essential part of the exposition of ideas and of more than a slight social interest as a step to truth and from which a benefit may be derived which is not clearly outweighed by the social interest in public order, public decency, and public morality."

As noted heretofore, the *Miller* Court rejected, as a constitutional standard, the *"utterly* without redeeming social value" test adopted in 1966 in *Memoirs v. Massachusetts, supra,* and promulgated in its place the third standard, whether the work, taken as a whole, lacks serious literary, artistic, political or scientific value. Elaborating upon the serious value test, later in the opinion, the Court said:

"At a minimum, prurient, patently offensive depiction or description of sexual conduct must have serious literary, artistic, political, or scientific value to merit First Amendment protection. See *Kois v. Wisconsin, supra,* 408 U.S., at 230–232, 92 S.Ct., at 2246–2247; *Roth v. United States, supra,* 354 U.S., at 487, 77 S.Ct., at 1310; *Thornhill v. Alabama,* 310 U.S. 88, 101–102, 60 S.Ct. 736, 743–744, 84 L.Ed. 1093 (1940). For example, medical books for the education of physicians and related personnel necessarily use graphic illustrations and descriptions of human anatomy. In resolving the inevitably sensitive questions of fact and law, we must continue to rely on the jury system, accompanied by the safeguards that judges, rules of evidence, presumption of innocence, and other protective features provide, as we do with rape, murder, and a host of other offenses against society and its individual members." 413 U.S. at 26, 93 S.Ct. at 2616.

The Tennessee Act's definition of "value" superimposes upon the third *Miller* test another three-prong test. The work (1) must be an essential part of the exposition of ideas and (2) must be of more than slight social interest as a step to truth and from which a benefit may be derived; if it passes those tests it (3) may be found to be "clearly outweighed by the social interest in pub-lic order, public decency, and public morality."

First, the requirement that to have "value" a work must be "an essential part of the exposition of ideas" is void and unconstitutional for vagueness, and because it introduces a test not within the contemplation of *Miller,* it would expose material entitled to first amendment protection to indiscriminate condemnation. *See Winters v. New York, supra; Underwood v. State, supra; Baggett v. Bullitt, supra.* Its unconstitutionality is further confirmed by *Kingsley Int'l Pictures Corp. v. Regents of N. Y. U., supra,* quoted hereinafter.

Second, the requirement that to have value a work must be of more than slight social interest as a step to truth and from which a benefit may be derived suffers from the identical constitutional infirmities stated in the preceding paragraph.

Third, the introduction of the notion that a work that otherwise passes the value test may be "clearly outweighed by the social interest in public order, public decency, and public morality" must be constitutionally condemned for the reasons applicable to the preceding elements of the "value" definition. Additional authority mandating the invalidity of this part and part one of the "value" definition is provided by *Kingsley Int'l Pictures Corp. v. Regents of N. Y. U., supra,* and *Papish v. University of Mo. Curators,* 410 U.S. 667, 93 S.Ct. 1197, 35 L.Ed.2d 618 (1973) (per curiam).

In *Kingsley* the work at issue was the motion picture "Lady Chatterly's Lover." Dealing with one of the issues raised by the State, the Court said:

"It is contended that the State's action was justified because the motion picture attractively portrays a relationship which is contrary to the moral standards, the religious precepts, and the legal code of its citizenry. This argument misconceives what it is that the Constitution protects. Its guarantee is not confined to the expression of ideas that are conventional or shared by a majority. It protects advocacy of the opinion that adultery may sometimes be proper, no less

than advocacy of socialism or the single tax. And in the realm of ideas it protects expression which is eloquent no less than that which is unconvincing." 360 U.S. at 688–89, 79 S.Ct. at 1365.

*Papish v. University of Mo. Curators, supra,* involved alleged indecent speech and an indecent cartoon in a college newspaper, wherein, after stating the principle that "state colleges and universities are not enclaves immune from the sweep of the First Amendment," the Court said:

"[T]he mere dissemination of ideas—no matter how offensive to good taste–on a state university campus may not be shut off in the name alone of 'conventions of decency.'" 410 U.S. at 670, 93 S.Ct. at 1199.

Thus all of the subdefinitions of the key words and phrases of the *Miller* standards are void for constitutional infirmities. We cannot assume that the general assembly would have enacted this legislation without those definitions, elide them and leave T.C.A. § 39–3002(c) and (d) as the Act's definition of "obscene material." But if that result were permissible under the doctrine of elision, those subsections do not specifically define "sexual conduct," which is required by *Miller*. That definition was attempted in T.C.A. § 39–3002(*1*). It is void, and we cannot insert a *Miller* acceptable definition of sexual conduct in its place, for the reasons and upon the authorities discussed in section IV of this opinion. *See Art Theater Guild, Inc. v. State ex rel. Rhodes,* 510 S.W.2d 258 (Tenn.1974) and *Wheeler v. Maryland,* 281 Md. 593, 380 A.2d 1052 (1977).

### III.

Next, we consider the constitutionality of classifying those subject to the criminal penalties of the Act as "a person, corporation or any other taxable entity," but excluding "natural persons acting as agents of a non-taxable entity."

The State's assignment of error, contesting the lower court's ruling that the classification was unconstitutional for vagueness and denial of equal protection of the law,

begins by insisting upon application of the rule that where there are several possible interpretations of a statute, one of which would preserve its constitutionality, that interpretation will be adopted by the Court. The State attempts to explain how simple it is to arrive at an interpretation that will save the Act as follows:

Use of the suffix 'able' normally has reference to whether a thing is possible or impossible. If a car is repairable, it can be fixed. On the other hand, if a car is irrepairable, it is impossible to fix it. If terrain is traversable, it is possible to traverse it. If terrain is untraversable, it is impossible to traverse it. Thusly, if an entity is taxable, it is possible to tax it. If it is non-taxable, it is impossible to tax it. It is that simple.

To determine whether it is possible to tax an entity, one must simply refer to the prevailing law or the Constitution. For instance, under prevailing jurisprudence, it simply is impossible for any state government to tax the federal government. Likewise, under current law, the state cannot tax itself. Under prevailing law, established religions may not be taxed. And, the federal government cannot tax state governments. As, and if, prevailing law changes so that what formerly was taxable becomes non-taxable or vice versus, those included in one classification or another may change; however, that fact is inconsequential in determining whether, at any given time, an entity is or is not taxable. But, whether an entity is or is not taxable is not definitionally vague. It is at all times a determinable fact, it is always knowable, i. e., able to be known, and not unknowable, i. e., unable to be known."

Thus we are told that reference to the constitution and the prevailing law will reveal the entities that it is *impossible* to tax and that will identify the classification of non-taxable entities.

Article II, § 28, Tenn.Const. (Supp. I 1978) reads in part as follows:

"In accordance with the following provisions, all property real, personal or mixed

shall be subject to taxation, but the Legislature may except such as may be held by the State, by Counties, Cities or Towns, and used exclusively for public or corporation purposes, and such as may be held and used for purposes purely religious, charitable, scientific, literary or educational, . . . ."

The constitutionally authorized exemptions to the State, counties and municipalities and to religious, charitable, scientific and educational institutions have been implemented by legislation. T.C.A. § 67–501 and T.C.A. § 67–513. However, it is not impossible to tax any of those exempt institutions because they are only exempt, in the case of the state and its political subdivision, to the extent that the properties are "used exclusively for public, county or municipal purposes. . . ." (T.C.A. § 67–501), and, in the case of religious, charitable, scientific and educational institutions, to the extent that the properties are "occupied and used . . . purely and exclusively . . . . for the purposes for which [the] institution was created . . . ." (T.C.A. § 67–513 Supp. XII 1978).

The State says that, under prevailing law, established religions may not be taxed.

The landmark case of *Book Agents of Methodist Episcopal Church, S. v. State Bd. of Equalization*, 513 S.W.2d 514 (Tenn.1974) compels a different conclusion. Three cases were consolidated for decision. The parties, insofar as relevant here, were Book Agents of the Methodist Episcopal Church and the Sunday School Board of the Southern Baptist Convention, each of said entities being a Tennessee nonprofit, general welfare corporation. The principal issue was whether or not those corporations owned, occupied and used their respective publishing operations in a manner that entitled each of the entities to the exemption provided in Article II, § 28, Tenn.Const. and T.C.A. § 67–502(2), presently codified as § 67–513. The exemption sought by the Methodist and Baptist entities was available if the properties in question were held and used purely, or exclusively, for religious, charitable, scientific, literary or educational purposes.

The evidence was that the Methodist and Baptist entities printed, published and sold secular literature, in addition to religious literature, and printed for some purely commercial operators. The majority of the Court held that the ad valorem property tax could be imposed on the printing press properties of the respective entities, prorated on the basis of the ratio of earnings derived from religious literature to total earnings, including secular literature. Thus, the State was authorized by this Court to tax a percentage of the printing and publishing properties of established religions, but at the same time leaving a percentage of their properties exempt from taxation. The unanswerable question posed by the Tennessee Obscenity Act of 1978 is whether the Methodist and Baptist entities, and their agents that are engaged in the printing, publishing and selling of books, an operation directly exposed to the Act, are subject thereto or exempt therefrom.

*Vanderbilt Univ. v. Ferguson*, 554 S.W.2d 128 (Tenn.Ct.App.1977), involved the issue of whether a parking lot provided for the faculty and staff of the Vanderbilt Medical Center was exempt from ad valorem taxation, by virtue of ownership and use, purely and exclusively, for religious, charitable, scientific or educational purposes. The first paragraph of the Court of Appeals opinion reflected that Vanderbilt University had a public parking lot adjacent to the property involved in the litigation, which it conceded was taxable. Thus we know that Vanderbilt University is a taxable—nontaxable entity. This presents another example of an entity whose librarians and other agents are exposed to the coverage of the Act, and the question of whether they are subject to its penalties or exempt therefrom is impossible to answer.

*LaManna v. Electrical Workers Local 474*, 518 S.W.2d 348 (Tenn.1974), presented a similar question of tax exemption. The decision reflects that a portion of the union's property is exempt from taxation and a portion is taxable.

It is likely that Vanderbilt University, the University of the South at Sewanee and

most of the private educational schools, colleges and universities in this State have properties and conduct activities that are taxable, and, at the same time, own and use other properties that are nontaxable. The same is true of many types of general welfare organizations, unions, trade and business associations, clubs and fraternal organizations. Many such organizations engage in educational and instructional activities, have libraries and publish newsletters and other periodicals.

We are convinced that all religious, charitable, scientific, educational and the many privately organized general welfare corporations that are created, in whole or in part, for religious, etc., purposes, would claim to be nontaxable entities, exempt from the Tennessee Obscenity Act of 1978, whether they pay taxes or not. But many, such as Vanderbilt University and the Methodist and Baptist Publishing entities, cannot legally sustain the burden of proving they are nontaxable entities. This is particularly true if the contention of the State is correct that the test is—"if it is non-taxable it is impossible to tax it. It is that simple."

Parenthetically, we find it unnecessary and redundant to pursue the legal potentiality of State, county and municipal properties being taxed, if not used exclusively for public purposes, and the resultant effect on nontaxable entity status. Nor is it necessary to delve into the vagueness problems presented by the other forms of taxation, such as sales and income taxes, etc., and the exemptions involved therein.

■ Two conclusions are inescapable. First, the use of taxable entity for inclusion and nontaxable entity for exclusion is too nebulous, too lacking in definite limits, and too vague to inform men of common intelligence who is included and who is exempt from the criminal penalties of the Tennessee Obscenity Act. *Winters v. New York, supra, Underwood v. State, supra, Barenblatt v. United States, supra* (Black, J., concurring and dissenting). T.C.A. § 39–3003 is therefore void under the Due Process Clause, Tenn.Const. art. I, § 8 and the U.S. Const. amend. XIV.

■ Second, if "nontaxable entity" could be construed to exempt those religious, charitable, scientific or educational general welfare corporations that pay no taxes and include those who pay any taxes, however small, the classification would have no rational basis in the context of the criminal offense involved herein and would be void under the Equal Protection Clause of the federal and state constitutions. U.S. Const. amend. XIV; Tenn.Const. art. I, § 8. In an analogous situation, the Maryland Court of last resort so held. In *Wheeler v. Maryland, supra*, the Court declared that State's obscenity law unconstitutional upon the contention of Wheeler, a bookstore employee convicted of violating the Act, that the Act's exemption of motion picture employees violated the Equal Protection Clause. The Maryland Court found no rational relationship to a legitimate governmental interest in subjecting to prosecution employees of bookstores and all other dispensers of obscenity, but exempting those employees of motion picture theaters who might exhibit obscene material.

### IV.

■ Having found that the sections that define the criminal offense that is the subject of the entire Act void and the section that identifies and classifies those who are subject to and exempt from its criminal penalties void, we have a criminal act with no legally cognizable offense and no identifiable parties to charge. It follows that the Tennessee Obscenity Act of 1978, 1978 Tenn.Pub. Acts, chs. 846, 920, is void and of no force and effect.

In these circumstances, application of the doctrine of elision is manifestly inappropriate. In *Art Theater Guild, Inc. v. State ex rel. Rhodes, supra*, this Court declared the obscenity definition applicable to that case (T.C.A. § 39–3007) unconstitutional because it did not comply with the definition in *Miller v. California, supra*. Responding to the State's contention that this Court should simply conform the statute to *Miller*, rather than hold it unconstitutional, the Court said:

**756**

"[W]e fail to find any basis for doing anything other than holding T.C.A. § 39–3007 unconstitutional and leaving it to the legislature to adopt a new obscenity statute which fully complies with all the requisites of *Miller v. California, supra.* Moreover, for this Court to do anything more would have the effect of our rewriting Tennessee's present obscenity statute. The function of this Court is to interpret a statute against the constitution of this State and that of the United States and we will not and cannot usurp the prerogatives of the legislature by supplying essential elements to a statute which have been omitted by that body." 510 S.W.2d at 261.

In addition to the same constitutional defect that we found in *Art Theater Guild,* this Court would be required to insert affirmatively into the Act, by judicial decree, a provision designating those persons, firms and corporations within the prohibition of the Act and identifying those to be exempt. The Legislature obviously intended that some persons, firms and corporations should be exempt, and we cannot assume they would have enacted this legislation if the class they had in mind could not be excluded. We cannot identify that class and it would be an encroachment on legislative prerogatives not authorized by the elision doctrine to insert it into the Act, if indeed, we could divine its identity. The severability clause is a mere aid to interpretation and does not alter the force of the rationale that compels the result reached. *See Wheeler v. Maryland, supra.*

A decree will be entered in this Court declaring the Act void. Costs are adjudged against the State of Tennessee.

HENRY, C. J., and COOPER, BROCK, and HARBISON, JJ., concur.