IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
December 16, 2020 Session

## STATE OF TENNESSEE v. MICHAEL BROYLES

**Appeal from the Criminal Court for Greene County**
**No. 17CR503    Alex E. Pearson, Judge**

_____

### No. E2019-01033-CCA-R3-CD

_____

The Defendant, Michael Broyles, was convicted by a Greene County Criminal Court jury of four counts of cruelty to animals, a Class A misdemeanor. *See* T.C.A. § 39-14-202(a)(2) (2018).  The trial court denied judicial diversion and sentenced the Defendant to eleven months, twenty-nine days for each conviction and imposed the sentences concurrently. The court ordered split confinement consisting of ninety days' jail service followed by probation.  On appeal, the Defendant contends that (1) the animal cruelty statute under which he was convicted is unconstitutionally vague, (2) the evidence is insufficient to support his convictions, (3) the court erred in denying judicial diversion, (4) the court erred in imposing a sentence involving confinement, and (5) the court erred in imposing fines and restitution without making the appropriate factual findings.  We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and D. KELLY THOMAS, JR., JJ., joined.

Gregory Eichelman, District Public Defender; Brennan M. Wingerter (on appeal), Assistant Public Defender – Appellate Division; and J. Todd Estep (at trial), Assistant District Public Defender, for the Appellant, Michael Broyles.

Herbert H. Slatery III, Attorney General and Reporter; Katherine C. Redding, Assistant Attorney General; Dan E. Armstrong, District Attorney General; David Baker, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

The Defendant's convictions relate to four horses belonging to Verland Prather, who had entrusted the Defendant with the horses' care. The Defendant claimed that he maintained a horse rescue operation at which the horses were used as therapy animals for domestic abuse survivors. He kept the horses on leased farm property.

At the trial, Greene County Sheriff's Detective Jimmy Willett testified that he and John Hodges of the Tennessee Department of Agriculture went to a farm on July 31, 2017, in response to a report of possibly abused animals. Detective Willett said that when he arrived, he saw a couple of horses that appeared to be healthy and that he later learned that these horses were not the ones that had been the subject of the report. He said he encountered the Defendant, who met him "in the treeline." Detective Willett said he went through a wooded area to a back field, where he saw a horse lying on the ground. He said the horse was in a one-third to one-half acre fenced area. He later said the fence "appeared to be taken down to where [the] horses was at." He said the horse appeared to be in distress and "was breathing funny." He said a circular area around the horse appeared to be where the horse had "pawed trying to get up." He thought water on the ground near the horse was there from the Defendant's effort to "pour the water down its mouth." Detective Willett said the Defendant stated that a veterinarian had been to see the horse on the previous day. Detective Willett said that the Defendant thought the horse was "wormy" and that the Defendant said he could not get Mr. Prather to obtain worm medicine. Detective Willett said that the Defendant stated he was trying to "get [the horse] better." Detective Willett said the Defendant stated he was trying to feed and water the horse and that a veterinarian had told him to "to try to get it up."

Detective Willett testified that the area around the horse had little vegetation. He said, "All the grass had been eat off." He said buckets of water and grain were present. Referring to a photograph exhibit, he agreed that a portion of the field in the background of the photograph had more vegetation. Detective Willett testified that he took photographs depicting the horses and the area, which were shown to the jury and received as exhibits. Detective Willett described the pasture area as "green till we get to the back field" and said a "little creek" without much water ran through the area. He said the amount of water in the creek "wouldn't have went over the top of [his] shoes." He said the creek was about ten feet from the horse that lay on the ground. He said he walked around the property and did not see other water sources but acknowledged he did not walk the entire property. He said that the horses on the property could roam into an area with grass on July 31, 2017. He said he could see where the horses had "torn down the fence." He said he saw fence posts on the ground which "appeared to have been there recently." A photograph exhibit shows fence posts in a stacked pile. Referring to a photograph, he identified a salt or mineral block.

Detective Willett testified that the Defendant gave Detective Willett a pamphlet about the Defendant's horse rescue services, and the pamphlet was received as an exhibit. The pamphlet advertised horsemanship training services related to improving horse obedience and to the relationship between horse and owner.

Detective Willett testified that on July 31, 2017, the Defendant showed him text messages between the Defendant and the horse's owner, Mr. Prather, in which the Defendant stated that Mr. Prather's horses had been "infested with worms" and had not had their hooves trimmed in five to six months at the time the Defendant received them. Detective Willett also stated that the Defendant showed him a text message in which the Defendant told Mr. Prather that Mr. Prather "had [Mr. Prather's] colt in a stall for four or five months" without exercise, without cleaning the stall, and subsisting on "nothing but oats." Detective Willett stated the Defendant's text messages to Mr. Prather said that Mr. Prather "let [Mr. Prather's] minis go untrimmed for over a year" and that the Defendant had "done nothing but try to fix [Mr. Prather's] abuse and negligence of these horses." Detective Willett acknowledged that he did not subpoena the Defendant's cell phone records to obtain the contents of additional text messages. Detective Willett said the text messages the Defendant showed him were from July 2017 and that he did not see any text messages from earlier months. Detective Willett said the Defendant forwarded to Detective Willett some emails between the Defendant and Mr. Prather.

Detective Willett agreed that the Defendant cried on July 31, 2017, and that the Defendant said he had prayed "for some sort of answer."

Detective Willett testified that he and the Defendant spoke by telephone with Dr. Fuller, the veterinarian the Defendant identified as having been to the farm the previous day. Detective Willett said Dr. Fuller stated he had seen the horse the previous day and that he told the Defendant to "get the horse up with a tractor and get it food and water." Detective Willett said the Defendant stated he "was not able to get access to a tractor." Detective Willett said that Dr. Fuller stated that a corral for the horses had been erected with nylon tape when Dr. Fuller had been at the farm the previous day. Detective Willett said the nylon tape corral was not present on July 31, 2017. Detective Willett said that he asked Dr. Fuller what could be done to help the horse and that Dr. Fuller responded that if the horse could not stand by now, it probably needed to be euthanized. Detective Willett said that Dr. Fuller did not give him instructions about how to euthanize the horse and that Detective Willett shot the horse. Detective Willett said the Defendant did not object.

Detective Willett testified that he knew from the investigation that the Defendant had kept four horses for Mr. Prather. Detective Willett said he and Mr. Hodges saw the horses, other than the one he had to shoot, at Mr. Prather's farm within a couple of days of July 31, 2017. Detective Willett described the three horses at Mr. Prather's farm as

-3-

"skinny" but said they were standing. Detective Willett said he and Mr. Hodges photographed the horses, and the photographs were received as exhibits.

Detective Willett testified that he spoke with Mr. Prather, Pam Prather, Dr. Fuller, and the Defendant in the course of the investigation. He agreed he did not talk to the owner of the farm where the Defendant kept the horses.

Billy Fuller, D.V.M., testified that he had been to the farm where the Defendant kept Mr. Prather's horses in the spring, a few days after the horses had been transported to the farm, to treat an injured horse. Dr. Fuller said he returned a couple of weeks later to check on the horse's healing. He said the Defendant had done a good job taking care of the horse because the horse was healing well. Dr. Fuller "vaguely" recalled stating at the preliminary hearing that he treated the injured horse on July 1, 2017, and made a visit on July 10 to check on the horse's healing. He said his basis of knowledge for the length of time the horses had been in the Defendant's care was information provided to him by Mr. Prather. Dr. Fuller said the Defendant did not live on the farm.

Dr. Fuller testified that he went to the farm on July 30, 2017, when the Defendant called him about "a down horse." Dr. Fuller said that when he arrived, he found the horse in a back pasture in a "polywire, plastic wire electric fence . . . paddock." He said the horse had access to water in a creek within the fenced area. He said the creek had a small amount of water. He said the fence prevented the horse from getting to the area where other horses were. He said the area where the horse was confined lacked grass and shelter. He said there was no food for the horse. He said that bark had been eaten from the trees and that the ground was bare. He said it appeared the horse had tried to eat weeds. He thought the horse had eaten feces because he did not see the expected amount of horse feces in the area. He said horses would eat feces if they did not have adequate food. He said the pasture area where the horse was confined was not adequate for a young horse.

Dr. Fuller testified that the horse was about age two and that young horses needed grass, water, and "sixteen percent feed" in order to grow. He said a horse should be dewormed every two months until age two. He did not know if Mr. Prather or the Defendant had given deworming medication to the horse. He said he and his intern collected and analyzed samples and determined that the horse did not have worms. He said that a young horse needed a barn or lean-to shelter to get out of the weather and that no shelter existed in the area where the horse was confined.

Dr. Fuller testified that he gave the horse vitamins, antibiotics, intravenous fluids, and dewormer. He said that after he and his intern treated the horse, it tried to stand but was unable to do so. He said the Defendant gave the horse oats and water in his presence. Dr. Fuller said the Defendant stated that Mr. Prather gave him nothing but oats to feed the horse. Dr. Fuller said that oats were an inappropriate diet for a young horse and that both

the Defendant and Mr. Prather should have known this. Dr. Fuller said the horse had muscle atrophy, which he said occurred over time and was unusual for a young horse. He said he advised the Defendant that in order for the horse to have a chance to live, the Defendant would need to lift and suspend the horse using farm equipment. Dr. Fuller said that he advised the Defendant to talk to local farmers and that farmers would usually help with a downed horse. Dr. Fuller said that when he heard the next day that the Defendant was not going to try to lift and suspend the horse, he concluded that the horse needed to be euthanized. He said that Detective Willett acted appropriately in shooting the horse because "[t]he horse was not going to get up." He said the horse would have been in pain.

Dr. Fuller testified that a horse's body condition score was rated one to nine. He said the downed horse's score "would probably be . . . a one," because the horse was "pretty thin, pretty weak, really emaciated." He said the horse "was neglected, not properly cared for." He agreed that the ideal score was five and that a score of nine would indicate an obese horse.

Dr. Fuller acknowledged that he had not brought veterinary records related to Mr. Prather's horses pursuant to a subpoena duces tecum that had been sent by facsimile from defense counsel to Dr. Fuller's office. Dr. Fuller said he had provided Detective Willett with a letter summarizing his veterinary care of the horses.

Dr. Fuller testified that when he had gone in the spring to treat the injured horse, the other horses "looked okay" when he glanced at them. He said he treated the surviving horses after Mr. Prather took them back to Mr. Prather's farm. Dr. Fuller said these horses "were getting thin" and that their body condition was "probably three out of nine." He said he saw the horses monthly for six months after they returned to Mr. Prather's farm and that they steadily improved after eating "better feed."

Dr. Fuller testified that he had treated horses for the Defendant before his work in the present case. Dr. Fuller said the Defendant's other horses "looked good" and thought the Defendant had the knowledge to understand that the downed horse was "lacking." Dr. Fuller said Mr. Prather's horses that were in the Defendant's care had been "neglected" and had "not been properly cared for." Dr. Fuller said that he had been disappointed in the Defendant relative to the downed horse and that the situation could have been avoided. Dr. Fuller said Mr. Prather's horses were thoroughbreds and agreed thoroughbreds were generally thinner than other horses.

Dr. Fuller acknowledged that he had pleaded guilty to obtaining money by fraud in 2013 in Virginia and that he had been reprimanded by authorities in Tennessee and Virginia relative to the misconduct. Relative to the incident, he agreed he wrote a letter stating he had performed autopsies on two of seventeen cows and that the cows had been struck by lightning. He said the cows' owner led him to believe the cows had been struck by

lightning but that the cows were still living. He said he should not have written the letter. He said that the incident was the only "blemish" on his record and that he made the decision not to "fight it to the fullest" because it was in his best interest not to fight.

Tennessee Department of Agriculture Animal Health Technician John Hodges testified that his job duties included assessing animals for body condition score and performing probable cause analyses relative to animal cruelty cases. He said he had completed Master Horse Certification and had bred and raised quarter horses.

Mr. Hodges testified that he received a complaint submitted to the Tennessee State Veterinarian's Office in July 2017 pertaining to the Defendant. He said he went to the Greene County farm where the Defendant kept the horses on July 31. He said one of Mr. Prather's horses and two horses belonging to the Defendant were present. Mr. Hodges said the Defendant's horses "were in great shape . . . [with] body conditions of four and five." Mr. Hodges said that Mr. Prather's horse had a body condition score of one and that she lay on the ground thrashing her legs and trying to get up but lacked the energy to do so. Mr. Hodges said Mr. Prather's horse was approximately one year old. He said horses under age two needed dietary supplementation with commercial feed containing 14% to 16% protein for proper growth and development. He said a horse the age of Mr. Prather's horse needed to be checked at least twice per day for general safety issues. He said they should be fed two or more times per day and that the supplemental feeding was in addition to access to lush pasture and water.

Mr. Hodges testified that he saw a stream with a "limited amount of water" near Mr. Prather's horse. He said the horse could not access the stream, however, because it could not stand. Mr. Hodges said that the Defendant stated that the horse had been "down" the previous day and that Dr. Fuller had treated the horse. Mr. Hodges said adequate shelter existed for the horse because a treeline was present but that adequate "forage" and water were not present because the horse could not access them. Mr. Hodges said that he and Dr. Fuller spoke by telephone and agreed that the horse should be euthanized. Mr. Hodges stated that Dr. Fuller said it would be at least three hours until he could come to the farm. Mr. Hodges said he called Mr. Prather and obtained Mr. Prather's consent for Detective Willett to shoot the horse.

Mr. Hodges testified that the area where the horse lay appeared to have had "animals confined there for a while." He noted "some fencing and some evidence that there had been some fencing there." He said, "[T]he forage had been eaten into the ground," and noted the area was "still fenced" on three sides. He said that he saw many hoofprints but little vegetation and manure in the area and that the number of hoofprints was consistent with multiple horses having been kept there.

Mr. Hodges testified that a day or two after July 31, 2017, he and Detective Willett went to Mr. Prather's farm to see the three surviving horses. Mr. Hodges said these horses "had body condition scores of one and a half and two." He agreed that the horses were thoroughbreds and that for thoroughbreds, the ideal body condition score was four and one-half, rather than five. He described the horses as "really undernourished" and noticed they had prominent rib, hip, and tail bones. He said they were in "critical condition." He agreed that the horses had "rain rot," which was similar to mange in dogs. He identified photographs of the horses, and the photographs were received as exhibits.

Mr. Hodges said he learned from Mr. Prather that the Defendant had been boarding the horses for Mr. Prather. Mr. Hodges said he had no knowledge of the terms of any agreement between Mr. Prather and the Defendant. Mr. Hodges said that the house on the farm where the Defendant kept the horses was boarded up and that he learned the Defendant did not live on the farm. Mr. Hodges said he did not see or hear any evidence of a logging operation on the farm.

Referring to a photograph taken at the farm where the Defendant had kept the horses, Mr. Hodges testified that the photograph depicted "fence stakes that were still some up . . . [and] some had been taken down[.]" He agreed that horses would have been confined to a barren area if a fence existed where it appeared the stakes had been taken up. He agreed that this area was noticeably different than the area where he saw the Defendant's horses.

Mr. Hodges agreed that horse feed should not be placed on the ground because the horses might consume parasites with the food. He agreed that photographs from Mr. Prather's farm showed horses eating from the ground. Mr. Hodges said he saw three miniature horses, in addition to the three thoroughbred horses, at Mr. Prather's farm. Regarding the photographs he was shown, Mr. Hodges said he could not identify the horses depicted in the photographs as the miniature horses he saw at Mr. Prather's farm. The photographs showed miniature horses with long, curled hooves. When asked whether he would complete "probable cause forms" relative to the condition of the horses' hooves in a photograph, he said, "Yes." He agreed that horses' hooves would not be in the condition shown in a photograph unless the hooves were neglected for a long time, which he estimated at six months. He said that it would be difficult to trim horses' hooves if they were "wild" or unable to be caught, in which case they would need to be tranquilized. He said he had no knowledge of when the Prathers acquired the miniature horses.

Pamela Prather testified that she was married to Verland Prather and that they had owned the four horses that were the subject of the charges in this case for a few months to a year "before [the Defendant]." She said they obtained the horses as "babies, . . . yearlings, maybe weanlings." She later agreed that they had two yearlings, a four-year-old male horse, and "the big filly." She said that prior to Mr. Prather's and her owning these horses,

she had taken care of other young horses and knew that young horses had additional needs beyond those of adult horses.

Ms. Prather testified that Mr. Prather found the Defendant on Craigslist and that Mr. Prather and she talked to the Defendant about "[b]reaking and desensitizing" their horses. She said that in addition to the horses that they had the Defendant train, she and Mr. Prather had three miniature horses given to them by Mr. Prather's coworker. She said she and Mr. Prather wanted the Defendant's help with the miniature horses "to try to get them where [they] could fix their feet and stuff" but that the horses ran and were difficult to catch. She said the Defendant liked the miniature horses, thought they were "good-looking animals," and did not say anything about needing to report that they were neglected or abused.

Ms. Prather testified that she and her husband paid the Defendant to come to their farm for four or five months to work with the horses before the Defendant took any horses to the farm the Defendant leased. She agreed the Defendant trained the thoroughbred horses and helped catch the miniature horses in order for their feet to be filed when he came to their farm. She agreed that the Defendant trimmed the miniature horses' hooves in April 2017. When shown photographs depicting three horses with long, curled hooves, she said the photographs were taken in a stall at her barn. When shown a photograph of thoroughbred horses being fed on the ground, she acknowledged that the photograph was taken on her property. She said that the Defendant was more knowledgeable about horses than she and her husband were, that she trusted him "[f]ully," and that she and Mr. Prather became friends with the Defendant. She acknowledged that early in their relationship with the Defendant, she wrote him a recommendation letter at his request.

Ms. Prather testified that, eventually, the Defendant told her that he might lease some property where it would be easier to work with the horses. She said that around this time, she and Mr. Prather obtained custody of their five grandsons and that it became harder for them to take care of the horses. She said the horses ate oats, horse feed, and hay. She said it was unsafe for the boys to be around the untamed thoroughbred horses. She said that their house was fifteen to twenty minutes from their farm and that she and her husband shared duties of going to the farm twice a day to care for the horses. She said the horses received regular veterinary care when they were at the Prathers' farm. She said Mr. Prather and the Defendant reached an agreement, whereby the Defendant took the four thoroughbred horses to the Defendant's leased farm. She said the Defendant was supposed to train, feed, water, and take care of the horses. She thought the financial arrangement "was maybe 150 per horse per month and we did the feed, sent feed and that type [of] stuff." She said her husband was more involved in details of the arrangement than she was.

Ms. Prather testified that she saw the four thoroughbred horses on the day they were transported to the Defendant's leased farm and that they were "fat" and "looked great." She said that when Mr. Prather brought the three surviving horses back to their farm, the

horses were "skin and bones." She said Mr. Prather had a veterinarian come to examine the horses within a day. She said Mr. Prather consulted with veterinarians, "people from UT," and "the agriculture people" about how to feed the horses because improper feeding could be fatal. She said that the horses began improving in one to three weeks and that caring for them was time-consuming during their recovery. She said that at first, the surviving horses had difficulty walking and little strength and that it took about one year to return the horses to good health. She said that at the time of the trial, the horses were in Louisiana and Kentucky being trained to race.

Ms. Prather testified that when she and Mr. Prather let the Defendant know they wanted to retrieve the horses, the Defendant delayed by saying he had other plans. She said that she took the last payment to the Defendant on July 29, 2017, and that he refused to accept a check and insisted on cash, even though he had previously accepted checks. She said that when she met with the Defendant to give him the money, he told her to keep working with the horses and to remember that they were "real wormy and . . . really skinny[.]" She said the Defendant did not say anything on July 29 which was specific to the condition of the horse which died on July 31.

Verland Prather testified that he found the Defendant through a posting on Craigslist and hired him to desensitize and train horses. Mr. Prather said that he viewed the Defendant as possessing superior knowledge to him relative to horse training and that the Defendant was able to direct the horses' behavior in a way that Mr. Prather was unable to do. Mr. Prather thought he paid the Defendant $200 per month, per horse for desensitization training. Mr. Prather said the Defendant worked with the horses two to three times per week for one and one-half to four hours per visit, depending on the weather and how long it took to accomplish the training. Mr. Prather said that the Defendant always preferred to be paid in cash but that Mr. Prather occasionally paid by check if he did not have cash.

Mr. Prather testified that the Defendant began training horses for him and Ms. Prather within a month or two of their grandchildren coming to live with him and Ms. Prather. Mr. Prather said he and the Defendant discussed the strain of having five grandsons living in the Prather household. Mr. Prather said he and the Defendant discussed the property the Defendant was considering leasing and came to an agreement for four of Mr. Prather's horses to be boarded with the Defendant. Mr. Prather said that, at the time, he worked seven days per week for twelve to sixteen hours per day, in addition to caring for his family and the horses. He thought the conversation took place in February or March of an unspecified year. He said the financial arrangement was for him to pay the Defendant $150 per horse, per month to take care of the horses and for the Defendant to provide grain and hay for them. Mr. Prather said that despite his having understood that the Defendant was to provide grain and hay for the horses, he did not think the Defendant ever did so. Mr. Prather said he agreed to pay an additional $600 for the Defendant to "break" the two-year-old filly, which was one of the four horses to be boarded.

Mr. Prather testified that the Defendant had the horses for about four months. Mr. Prather said that a few days before the horses were returned to him, the Defendant demanded more money or horse feed and that Mr. Prather took 200 pounds of oats, "four or five wormers," and a check for $100 for hay, in addition to the previously agreed upon $600 for four horses per month. Mr. Prather said that he knew this "was beyond the deal" he and the Defendant made but that he would do whatever it took to take care of his horses. Mr. Prather later said he took these items to the Defendant of his own volition after seeing a photograph depicting the horses' conditions.

Mr. Prather testified that at some point, he received a text message containing a photograph of an injury on one of the horses and that he expressed concern that the horse had lost a significant amount of weight. Mr. Prather said that the Defendant "held my horses ransom, wouldn't let me have my horses" until Mr. Prather paid $480 in cash, not by check. Mr. Prather said the Defendant delayed repeatedly when Mr. Prather tried to make arrangements to get the horses.

Mr. Prather testified that he went to the Defendant's leased farm with Jimmy Brooks and Chris Yates to get the horses. He thought the date was July 30, 2017, but he was unsure. Mr. Prather said that he saw three of his horses "in the round pen with dirt, no water, no hay, no nothing" and that he knew there was a problem. Mr. Prather said the Defendant stated the horses had "rapid growth," were "wormy," and might have been poisoned by eating cherry tree bark. Mr. Prather said that he asked about the fourth horse, that the Defendant stated the horse was lying in a field, and that he told the Defendant to "get it up." Mr. Prather said he, Mr. Brooks, and Mr. Yates tried to get the downed horse to stand using a rope, pushing her, and kicking her. Mr. Prather said the horse tried to stand but could not. He said the Defendant stated, "I've done it all this morning," and claimed the horse had eaten food the Defendant had taken to her that morning. Mr. Prather said that he called Dr. Fuller to check on the downed horse and that he took the other horses back to his property. Mr. Prather said he knew the downed horse was going to die because horses lost circulation if they stayed down too long. Mr. Prather said the Defendant blamed Mr. Prather for the horses' condition shortly before Mr. Prather retrieved the horses. Mr. Prather said he saw the Defendant's horses when Mr. Prather went to pick up Mr. Prather's horses and described the Defendant's horses as "nice and fat."

Mr. Prather identified photographs of his horses that had been in the Defendant's care. The photographs were taken a few months before the horses went to the Defendant's leased farm and showed the horses' conditions. Mr. Prather said the two smaller horses arrived at his property in late 2016 and did not recall when "the big colt and the big filly" arrived. Mr. Prather said he had used three veterinarians – Dr. Chambers, Dr. Reel, and Dr. O'Connell – before the horses went to the Defendant's leased farm and used Dr. Fuller

once the horses were at the Defendant's leased farm because Dr. Fuller was local to the Defendant's leased farm.

Mr. Prather testified that the three horses were thin when they returned from the Defendant's leased farm. Mr. Prather said that he was surprised that one of the horses that was returned to him survived because she was "awful close to death." Referring to a photograph of the horse that died on July 31, 2017, Mr. Prather said the horse had not appeared as it did in the photograph when it went to the Defendant's leased farm. Mr. Prather said it took nine months to return the three horses to good health. He said that he had to follow a specified feeding plan and that he had Dr. Fuller provide regular veterinary care. Mr. Prather said the horses were malnourished, not in poor health due to parasites or worms.

Mr. Prather testified that he did not visit the horses while they were in the Defendant's care because of his rigorous work schedule and family obligations. Mr. Prather said he had faith in the Defendant and would not have entrusted the horses to the Defendant's care otherwise. Mr. Prather said that in the horse industry, an owner will not hear from a person taking care of the owner's horses unless a problem exists. Mr. Prather said he did not hear from the Defendant except when an issue arose relative to the horses. Mr. Prather said he lost $25,000 in breeding fees for the horse that died.

Lynn Fisher testified for the defense that he transported horses from Parrottsville, which other evidence showed was the location of Mr. Prather's farm, to the Defendant's property, but that he did not know when he transported the horses. Mr. Fisher said he had owned horses most of his life. He said the horses he transported were thoroughbreds and were "thin but they weren't starved to death by no means." He said, "They could have used a little more feed but they weren't ready to die or anything." He said the horses were able to walk. He said thoroughbred horses were "naturally fine boned and thin."

John Hodges was recalled and testified in reference to photographs of the Prathers' miniature horses with long, curled hooves, that if he "saw those today," he would tell the owner how to correct the issue and would give them about a week to remedy the issue before pursuing criminal charges. He said feeding horses from the ground was not the best option. He said, however, that the downed horse he found on the Defendant's property was tested and did not have parasites. Mr. Hodges agreed that a horse who had been wormed two to three weeks before testing would not have parasites. He agreed that if the Defendant had received the horses in a weakened condition, agencies and horse rescues existed which could have assisted in preventing death or physical deterioration. He said that most veterinarians would treat a suffering animal before receiving payment.

Ben Bragg testified that he and his mother owned a thirty-acre farm which they leased to the Defendant. Mr. Bragg said the farm contained eighteen to twenty acres of

fenced pasture. Mr. Bragg said he had seen six or seven horses on the farm around April through July 2017. He said the horses were in a pasture eating every time he saw them. He said the creeks on the property had not been dry since a drought in approximately 1998. He said the farm had "plenty" of pasture and water.

Mr. Bragg testified that in mid-July 2017, he had about two acres of the property "logged off." He thought the loggers "cut a little road in" and removed part of a fence line daily for six or seven days and replaced it at night. Referring to a photograph, Mr. Bragg said a brown area in the photograph was the area where logging had occurred. When asked about horse hoofprints in the brown area of the photograph, he said the horses "could go anywhere they want up there." He said he never saw a horse in distress on the farm.

The Defendant testified that he became interested in horses in late 2014 and connected with Virgil Peters on Craigslist, who later gave him a horse. The Defendant said Mr. Peters allowed him to keep the horse Mr. Peters gave the Defendant on Mr. Peters' property in exchange for farm work and that the Defendant learned how to take care of horses from Mr. Peters. The Defendant said he did not know much about horses at first and that he researched and talked to experts to learn. He said he purchased and participated in a virtual learning program for "barefoot hoof trim[ming]" and later "mentored with" Primary Hooves for hands-on education in trimming hooves and in dietary issues and ailments related to horses' hooves.

The Defendant testified that beginning with his first meeting with the Prathers, he told them the miniature horses' hooves needed to be trimmed. The Defendant said that he was "taken aback" at the condition of the miniature horses' hooves and that the horses were "foundered" and in obvious pain. He said he did not trim their hooves until April 14, 2017, because he had not completed his training. He said the horses were not hard to catch because they "barely walked."

The Defendant testified that he worked with Mr. Prather's horses on the Prathers' farm on October 29, 2016, and throughout November 2016. He described the training and desensitization he provided for the horses. He said he did not return to the Prathers' farm until the last week of March 2017.

The Defendant testified that the Prathers had not been truthful when they testified that he worked with their horses for several months at the Prathers' farm. The Defendant said that when he arrived at the Prathers' farm in March 2017, he was "flabbergasted, bewildered, upset" at the conditions he found. He said that the gate was broken from the stall of the "big filly" and that he later learned from Mr. Prather that the filly had broken out of the stall about one month earlier. The Defendant said that the "big colt" stood in one to two feet of its own feces and urine and that the smell nauseated the Defendant. He said the colt had foundered and had four-inch hoof flares. He said he learned from Mr.

-12-

Prather that the colt had not been out of its stall in four months, had not had hay in two months, and had eaten nothing but oats. He thought six horses were on the farm, which he estimated was six or seven acres. He said that the farm was "completely eaten down" and that all the horses were eating oats.

The Defendant testified that he talked to Mr. Prather about taking the horses to the farm the Defendant had recently leased in order to rehabilitate the horses and establish a healthy diet. The Defendant said the agreement was for "pasture boarding," which entailed food, water, shelter, and care for four horses for $150 per horse, per month, at the Defendant's leased farm. The Defendant said there was no agreement about supplementing the horses' diets with extra food but that he gave them "a product called DE," which he said was similar to a vitamin, mixed into oats.

The Defendant testified that Mr. Prather's horses came to his farm on April 1, 2017, and that the horses had access to the entire farm until July 24, 2017, when he restricted them to a one-acre paddock because of logging activity on the farm. He said a creek ran through the paddock. He said the horses were in the paddock from "[m]idday Monday to 9 or 10 o'clock Friday morning." He said he checked on the horses "multiple times" when they were confined to the paddock. He said he first noticed the downed horse when he went to the farm on July 30 around 2:30 p.m. He said that the horse had been "[u]p and moving about like the rest of them" the previous morning. He said the horse was "severely underweight" before it went down and that all of Mr. Prather's horses were underweight. The Defendant said he called Dr. Fuller immediately upon finding the downed horse. The Defendant said he had not sought medical care sooner because he had understood from Dr. Fuller when Dr. Fuller saw the horses on July 15 that the horses' conditions were improving.

The Defendant testified that the photographs showing hoof prints on bare ground depicted a shaded area where the horses stood. He said the horses had worn down the grass and made three trails as they moved around the property. He said he kept a barn door open all the time in order for the horses to have shelter from the cold as needed. He identified a photograph exhibit, which he said depicted Mr. Prather's "big filly" eating her daily oats and DE in the barn.

The Defendant testified that after three months, he started to feel like he was being taken advantage of due to the boarding arrangement. He said that on June 26, 2017, he called Mr. Prather to tell him he thought the horses had parasites. The Defendant said that he learned from Mr. Prather that the horses had never been "dewormed" while in the Prather's care and that the Defendant gave them deworming medication on July 1 and July 15. The Defendant said the horses' conditions appeared to improve after he gave them the medication.

-13-

The Defendant testified that Dr. Fuller came to the Defendant's farm on July 9 and 15, 2017, to treat the big filly's injured shoulder. The Defendant said Dr. Fuller stated on July 15, that the horses were gaining weight and improving. The Defendant said he, not Mr. Prather, called Dr. Fuller to treat the filly's injury. The Defendant said Mr. Prather was upset with him for calling Dr. Fuller without first telling Mr. Prather.

The Defendant testified that he did not purposefully place the horse that died on July 31, 2017, in a paddock for five or six days without food. He said Mr. Prather never came to the farm, other than on the day Mr. Prather picked up the horses. The Defendant said that, in his opinion, Mr. Prather's horses were not "in perfect health" when they arrived at the Defendant's leased farm and that their condition continued to deteriorate until he gave them the deworming medication.

The Defendant testified that he checked on the horses daily and sometimes twice daily when they were at his leased farm. He said he sent photographs of the two yearlings and the big filly at Mr. Prather's request on June 22, 2017. When asked why he did not send a photograph of the colt, the Defendant said Mr. Prather only requested photographs of three horses. The Defendant said he "[v]aguely" recalled a text message from Mr. Prather expressing concern about the horses' appearances in the photographs and asking about the quantity of oats which would be required to feed the horses.

The Defendant identified a flyer which previously had been received as an exhibit regarding his horse rescue operation. He said he contacted the Department of Agriculture, Sullivan County Animal Control, Washington County Sheriff's Department, and Secretary of State to establish the rescue, which he said had a dual purpose of helping horses and using them as therapeutic animals for domestic abuse survivors. The Defendant said he considered his taking Mr. Prather's horses to the Defendant's farm to be an "action of rescue" because the horses were "thin, foundered" and would have died if they stayed in their those conditions.

The Defendant testified that in 2017, he had a few other horse-training clients, but he agreed that the Prathers were his primary source of income. He acknowledged that he also received a "veteran's disability stipend." The Defendant denied that the $150 per month, per horse fee was to include the Defendant's providing hay and oats. When shown a document depicting a text message to Mr. Prather which stated, "Pasture boarding for $150 a month per horse, that includes grain and hay when needed in winter," the Defendant explained that he thought the previous question had referred to the summer months. The Defendant said hay was not needed in summer. The Defendant said that, at the time of the trial, he had ten to twelve horse training clients.

After receiving the evidence, the jury found the Defendant guilty of four counts of animal cruelty, consisting of one count for each of the Prathers' four thoroughbred horses.

-14-

At a sentencing hearing, the trial court denied the Defendant's request for judicial diversion, sentenced the Defendant to eleven months, twenty-nine days for each conviction, ordered that the sentences be served concurrently, ordered split confinement consisting of ninety days' jail service followed by probation, imposed restitution of $6000, and approved fines of $7000. This appeal followed.

# I

## Constitutionality of the Animal Cruelty Statute

The Tennessee animal cruelty statute provides: "A person commits an offense who intentionally or knowingly . . . [f]ails unreasonably to provide necessary food, water, care or shelter to an animal in the person's custody[.]" *See* T.C.A. § 39-14-202(a)(2). The Defendant contends that the statute is unconstitutionally vague and overbroad because it fails to define the term "care" and that it is unconstitutional as applied to him because he was convicted based upon the jury's factual finding that he failed to provide the requisite "care" to Mr. Prather's horses. The State counters that the Defendant has waived his constitutional challenge by failing to raise it before the trial and that plain error relief is not appropriate. The Defendant responds that the issue was not required to be raised before the trial, that the State waived its waiver argument by failing to raise it when the Defendant raised the constitutional challenge in the motion for a new trial, and that this court should conduct plenary review of the constitutional issue.

We begin with the question of waiver. The State argues for the first time on appeal that consideration of the constitutional challenge is waived because the Defendant was required to raise the issue in a pretrial motion pursuant to Tennessee Rule of Criminal Procedure 12(b)(2). This rule provides that a defendant is required to raise pretrial "a motion alleging a defect in the indictment, presentment, or information—but at any time while the case is pending, the court may hear a claim that the indictment, presentment, or information fails to show jurisdiction in the court or to charge an offense[.]" Tenn. R. Crim. P. 12(b)(2). Further, Rule 12 provides, "Unless the court grants relief for good cause, a party waives any defense, objection, or request by failing to comply with . . . rules requiring such matters to be raised pretrial[.]" *Id.* at 12(f)(1).

The State cites *State v. Rhoden*, 739 S.W.2d 6, 10 (Tenn. Crim. App. 1987), and *State v. Minor*, 546 S.W.3d 59, 65 (Tenn. 2018), for the proposition that a challenge to the constitutionality of a statute must be raised pretrial and that it is waived if no pretrial challenge is made. In *Rhoden*, the defendant challenged the constitutionality of the former statute proscribing the use of minors for obscene purposes, alleging that the definition of "sexual conduct" provided in a subsection of the statute was overly broad. *Rhoden*, 739 S.W.2d at 10. The court determined, however, that the issue was waived because the defendant failed to raise the issue in a pretrial motion pursuant to Rule 12(b) of the

Tennessee Rules of Criminal Procedure, notwithstanding his having raised it in the motion for a new trial. *Id.*

In *Minor*, the defendant did not challenge the constitutionality of the Criminal Gang Offense Statute in the trial court and raised the issue for the first time on appeal, after an intervening ruling by an appellate court declaring the statute unconstitutional in another case. *See Minor*, 546 S.W.3d at 64-65. Noting the need to provide the parties with an opportunity to fully develop their positions and to afford the trial court an opportunity to prevent or correct error before a judgment becomes final, the supreme court held that the defendant had failed to preserve the issue for plenary appellate review. *See id.* at 65. Nevertheless, the court acknowledged its purview to "grant relief when fairness and justice demand," and it considered the matter within the parameters of the plain error doctrine. *See id.* at 65-75.

In *State v. Kaylecia Woodard*, No. E2016-00676-CCA-R3-CD, 2017 WL 2590216, at *6-10 (Tenn. Crim. App. June 15, 2017), a panel of this court considered whether a defendant waived plenary review of a challenge to the constitutionality of a statute by failing to raise it before the trial. In advancing its waiver argument, the State cited *Rhoden*. *See Kaylecia Woodard*, 2017 WL 2590216, at *6. The *Kaylecia Woodard* panel noted that although *Rhoden* spoke in broad terms about waiver of any constitutional challenge not made by pretrial motion pursuant to Rule 12(b), "*Rhoden* did not involve a facial constitutional challenge to the proscriptive statute itself but was instead a challenge to the statute that supplied the definition for one of the terms in the proscriptive statute." *Id.* at *8. The *Kaylecia Woodard* panel concluded that although some constitutional issues were waived if they were not raised by pretrial motion, a challenge alleging that a statute is unconstitutional on its face is not subject to waiver because the statute is invalid under any possible circumstances. *Id.* at *9 (citing *State v. Bonds*, 502 S.W.3d 118, 161 (Tenn. 2016); *Waters v. Farr*, 291 S.W.3d 873, 882 (Tenn. 2009)). "In consequence, a claim that the proscriptive statute is unconstitutional on its face strikes at the jurisdiction of the convicting court and, as a result, may be raised at any time before the sentence has expired, even in a petition for the writ of habeas corpus." *Id.* (citing *Archer v. State*, 851 S.W.2d 157, 160 (Tenn. 1993)). Thus, a statute which is unconstitutional upon its face is void and cannot serve as the basis for a valid conviction. *Id.* (citing *State v. Dixon*, 530 S.W.2d 73, 74 (Tenn. 1975)). The *Kalecia Woodard* court observed that Rule 12(b)(2) permits a challenge to the court's jurisdiction to be raised at any time. *See id.* at *10. Ultimately, the *Kaylecia Woodard* court concluded that the defendant had not waived her challenge to the facial validity of the statute in question and ruled, in accord with the decisions of other panels of this court, that the statute was unconstitutional. *Id.* at *11.

More recently, a panel of this court conducted plenary review of a challenge to a statute as being void for vagueness where the defendant did not raise the issue by pretrial motion and first raised it in the motion for a new trial. *See State v. Robert Jason Allison*,

No. M2017-02367-CCA-R3-CD, 2019 WL 4072139, at \*7-8 (Tenn. Crim. App. Aug. 29, 2019); *aff'd in part, rev'd in part, remanded*, 618 S.W.3d 24 (Tenn. 2021). In addressing the State's argument that the issue was waived because it had not been raised by pretrial motion, this court noted without discussion that the issue had been raised in the motion for a new trial. *See Robert Jason Allison*, 2019 WL 4072139, at \*7. On further appeal, the supreme court conducted plenary review without discussion of the waiver argument the State had raised in the Court of Criminal Appeals. *See Allison*, 618 S.W.3d at 44-46.

As we have stated, the Defendant contends that the statute is unconstitutional on its face as well as in its application to him on the facts of this case. We conclude, in accord with the analysis in *Kaylecia Woodard*, and in accord with the treatment of the question of waiver in this court's and the supreme court's opinions in *Allison*, that the Defendant's challenge was not waived by the lack of a pretrial motion and that plenary review is appropriate. *See id.*; *Robert Jason Allison*, 2019 WL 4072139, at \*7-8; *Kaylecia Woodard*, 2017 WL 2590216, at \*6-10.

The Defendant argues that the statute is facially, unconstitutionally vague and overbroad because the term "care" is undefined, thereby causing the statute to fail in providing notice or sufficient warning as to the prohibited or prescribed conduct. *See* T.C.A. § 39-14-202(a)(2). The Defendant argues that, unlike many other jurisdictions, Tennessee does not define the conduct which is required to avoid criminal liability and that the plain meaning of the word "care" is too broad to provide notice of the prohibited conduct under the animal cruelty statute.

When a statute is challenged as being overbroad and vague, the court must first determine whether the statute "reaches a substantial amount of constitutionally protected conduct." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494 1982); *see State v. Burkhart*, 58 S.W.3d 694, 700 (Tenn. 2001). If the statute does not meet this mark, the overbreadth challenge must fail. *Village of Hoffman Estates*, 455 U.S. at 494; *see State v. Pickett*, 211 S.W.3d 696, 702 (Tenn. 2007) ("The constitutional test for overbreadth is whether the statute's language overreaches unlawful conduct and encompasses activity that is constitutionally protected."). The inquiry then becomes one of any facial vagueness of the statute. *Id.*

In the present case, the Defendant argues that the animal cruelty statute is "unconstitutionally vague and overbroad on its face," but he has not identified any constitutionally protected activity upon which he alleges the statute infringes. Thus, his overbreadth challenge must fail. *See id.* We now move to the inquiry into whether the statute is facially void for vagueness.

A criminal statute must comport with due process of law. U.S. Const. amend. XIV, § 1 ("[N]or shall any state deprive any person of life, liberty, or property, without due

process of law"); Tenn. Const. art. I, § 8 ("[N]o man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land."). Due process compels that a criminal statute must provide "fair warning" of its proscribed conduct, whereby a person may understand and avoid the conduct which is prohibited by the statute. *State v. Thomas*, 635 S.W.2d 114, 116 (Tenn. 1982); *see Pickett*, 211 S.W.3d at 794. A criminal statute "may be facially vague if it authorizes and encourages arbitrary and discriminatory enforcement." *Burkhart*, 58 S.W.3d at 699. A criminal statute which prohibits an act "in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law." *Leech v. Am. Booksellers Ass'n, Inc.*, 582 S.W.2d 738, 746 (Tenn. 1979). However, our supreme court has recognized the "inherent vagueness" of statutory language. *Pickett*, 211 S.W.3d at 704. "[A]bsolute precision" is not required of statutory language. *State v. McDonald*, 534 S.W.2d 650, 651 (Tenn. 1976).

Our supreme court has said that statutory interpretation requires a court to "first ascertain and then give full effect to the General Assembly's intent and purpose." *Waldschmidt v. Reassure America Life Ins. Co.*, 271 S.W.3d 173, 176 (Tenn. 2008). The inquiry begins with examining the statutory language and applying its ordinary and plain meaning. *Blankenship v. Estate of Bain*, 5 S.W.3d 647, 651 (Tenn. 1999). In this regard, the court must (1) give the words of the statute their natural and ordinary meaning, (2) consider the words in the context of the entire statute, and (3) presume that the General Assembly intended for each word to be given its full effect. *Waldschmidt*, 271 S.W.3d at 176. If a statute is clear and unambiguous, the court must enforce it as written without looking beyond the statute itself. *Id.* The question of the constitutionality of a statute is one of law, which we review de novo without a presumption of correctness. *Colonial Pipeline Co. v. Morgan*, 263 S.W.3d 827, 836 (Tenn. 2008).

Code section 39-14-202 is captioned "Cruelty to animals" and provides, in part:

(a) A person commits an offense who intentionally or knowingly:

(1) Tortures, maims or grossly overworks an animal;

(2) *Fails unreasonably to provide necessary food, water, care or shelter for an animal in the person's custody;*

(3) Abandons unreasonably an animal in the person's custody;

(4) Transports or confines an animal in a cruel manner; or

-18-

(5) Inflicts burns, cuts, lacerations, or other injuries or pain, by any method, including blistering compounds, to the legs or hooves of horses in order to make them sore for any purpose including, but not limited to, competition in horse shows and similar events.

(Emphasis added.)  The statute also criminalizes restraining a dog in a manner that causes bodily injury to the animal and certain interferences with the performance of agricultural practices.  T.C.A. § 39-14-202(b), (f)(2).  Thus, the statute targets both actions and failures to act which are contrary to animal welfare.

As the Defendant observes, Code section 39-14-202 does not define the term "care."  In determining the natural and ordinary meaning of words used in a statute, reference to a dictionary may be appropriate.  *See State v. Majors*, 318 S.W.3d 850, 859 (Tenn. 2010); *State v. Williams*, 690 S.W.2d 517, 529 (Tenn. 1985).  Black's Law Dictionary defines "care" as "[w]atchful attention; concern; custody; diligence; discretion; caution; opposite of negligence or carelessness; prudence; regard; preservation; security; support; vigilance. To be concerned with, and attend to, the needs of oneself or another."  Care, *Black's Law Dictionary* (6th ed. 1990).  Tennessee Code Annotated section 39-14-202(a)(2) criminalizes the conduct of a person "who intentionally or knowingly . . . [f]ails *unreasonably* to provide necessary . . . care . . . to an animal in the person's custody[.]"  *See* T.C.A. § 39-14-202(a)(2) (emphasis added).  Thus, the definition of "reasonable care" also provides guidance:

Reasonable care is such a degree of care, precaution, or diligence as may fairly and properly be expected or required, having regard to the nature of the action, or of the subject-matter, and the circumstances surrounding the transaction.  It is such care as an ordinarily prudent person would exercise under the conditions existing at the time he is called upon to act. Substantially synonymous with ordinary or due care.

Care, Reasonable Care, *Black's Law Dictionary.*

The natural and ordinary meaning of the word "care" and its use in the statute, viewed in the context of these definitions and of the language of the statute's additional prohibitions, is apparent.  The statute gives fair notice that a person with an obligation to care for an animal is subject to an objective standard of reasonableness in providing for the animal's needs.  Likewise, it gives guidance to law enforcement personnel as to the prohibited conduct in order to avoid arbitrary enforcement.  "The fact that a statute applies in a wide variety of situations and must necessarily use words of general meaning does not render it unconstitutionally vague."  *State v. Webb*, 130 S.W.3d 799, 828 (Tenn. Crim. App. 2003) (holding that T.C.A. § 39-14-202(a)(2) was not unconstitutionally vague based

upon its use of the word "necessary"). The statute is not void on its face based upon the use of the word "care."

In reaching this conclusion, we have not overlooked the Defendant's argument that the use of the term "care" in the title to Code section 39-14-207 and the use of the term "emergency care" in Code section 39-14-215(a)(3) do not assist in determining the meaning of the word "care" in Code section 39-14-202(a)(2). *See id.* § 39-14-207 (titled "Impounded animals; care" and providing for entry onto property where an impounded animal is kept without necessary food or water and for veterinary treatment of an animal which is "injured, diseased, suffering from the elements, or malnourished"); 39-14-215(a)(3) (defining "emergency care" as "medical and other health treatment, services, or accommodations that are provided to an injured or ill animal for a medical condition or injury of such a nature that the failure to render immediate care would reasonably likely result in the deterioration of a sick or injured animal's condition or in the animal's death" and providing for such emergency care for non-livestock animals found "running at large, abandoned, injured or in distress due to an emergency). The Defendant also invites this court to engage in an analysis of the animal welfare statutes of other jurisdictions. Because the plain meaning of the statute is apparent, it is unnecessary for us to consider the extent to which, if at all, other sections in the same Part of the Code and the statutes of other jurisdictions provide guidance. *See Waldschmidt*, 271 S.W.3d at 176 (stating that a clear and unambiguous statute must be enforced as written, without looking beyond the statute itself).

We turn to the Defendant's challenge to the statute as being unconstitutional as applied to him. A challenge to a statute as being unconstitutional as applied to a defendant considers how the statute "'operates in practice against the particular litigant and under the facts of the instant case, not hypothetical facts in other situations.'" *City of Memphis v. Hargett*, 414 S.W.3d 88, 107 (Tenn. 2013) (quoting 16 C.J.S., *Constitutional Law* § 187, at 274 (2005)).

The Defendant argues that the State relied at trial on the theory that the Defendant unreasonably failed to provide necessary food, water, care, or shelter to Mr. Prather's horses and that the jury's factual finding that he unreasonably failed to provide the horses with "care," due to the lack of definition of this term, resulted in the jury's reaching a non-unanimous verdict. He argues that the absence of a definition of "care" permitted the jury to reach non-unanimous verdicts because they could have interpreted "care" to include "a lack of food, water, or something else entirely, such as a lack of veterinary care or a general lack of attention or concern." He notes that the verdict forms required the jury to make a specific finding as to which of the statutory factors they found the Defendant failed to provide and that the jury found only that the Defendant failed to provide the horses with "care." He likewise notes that the State argued to the jury that "care could probably fall

under or encompass anything." The Defendant posits that the jury may have reached a non-unanimous, compromise verdict.

We note that the check boxes for food, water, care, and shelter appeared on the verdict form before the corresponding element. Thus, the box for food preceded the word "food." The box for shelter appeared after the word "care" at the end of a line, and the word shelter appeared on the next line. When the jury returned its verdict, they had checked the box which corresponded with "shelter," but the foreman reported verbally that they found the Defendant had failed to provide "care" to each of the horses.

In any event, the Defendant's argument regarding juror unanimity is not compelling. First, the record reflects the parties and the trial court conferred off the record regarding the jury instructions and that the court later stated on the record that the parties and the court were in agreement that the verdict form providing check boxes for the individual statutory modes of committing the offenses "was the way to handle that and that way we can be sure that there is a unanimous verdict." In addition, the record reflects that after closing arguments and before the final instructions were read, the court asked the parties if they had read the instructions and had objections. Both the prosecutor and defense counsel stated that they were in agreement with the instructions. The court then instructed the jury that the State must prove, inter alia, that the Defendant "failed unreasonably to provide necessary food, water, care or shelter[.]." The Defendant did not challenge the instruction in the motion for a new trial. The Defendant cannot, after having agreed to the instructions and the verdict form as proper, object to the procedure employed by the court in having the jury make specific findings regarding the specific mode of commission of the offenses. T.R.A.P. 3(e) (stating that an issue regarding jury instructions granted or refused must be raised in the motion for a new trial, or it will be treated as waived); T.R.A.P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party . . . who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error"); *State v. Gilley*, 297 S.W.3d 739, 762 (Tenn. Crim. App. 2008) ("The failure to make a contemporaneous objection constitute[s] waiver of the issue on appeal.").

More significantly, however, the requirement that the jury reach a unanimous verdict does not include the requirement that the jury unanimously agree as to a particular theory of guilt to support the conviction for a single crime. *See State v. Keen*, 31 S.W.3d 196, 208 (Tenn. 2000); *State v. Quadarious Devonta Bufford*, No. W2018-00548-CCA-R3-CD, 2019 WL 3072121, at *7 (Tenn. Crim. App. July 12, 2019) ("When . . . there is evidence of only one offense, which can be committed in alternate ways, there is no need for the State to elect the theory under which it seeks conviction."), *perm. app. denied* (Tenn. Dec. 10, 2019).

Turning, then, to the question of whether the animal cruelty statute is unconstitutional as applied to the Defendant, we again note that the natural and ordinary

meaning of the word "care," viewed in the context of the statute, placed the Defendant on notice that he must provide the necessary care which a reasonable person in his situation would provide for the horses. As we will discuss further in section II below, the evidence showed that the Defendant failed to provide reasonable care to the horses in multiple respects. The Defendant, who held himself out as a horse trainer and as a provider of horse boarding services, and who had access to veterinary guidance, was in a position to determine the measures reasonably required of a person in his position to provide necessary care to the horses. Code section 39-14-202(a)(2) is not unconstitutional as applied to the Defendant. He is not entitled to relief on this basis.

## II

### Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support his convictions. The State counters that the evidence is sufficient. We agree with the State.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt[.]'" *Rice*, 184 S.W.3d at 662 (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)).

As we have stated, a defendant who intentionally or knowingly "[f]ails unreasonably to provide necessary food, water, care or shelter for an animal in the person's custody" is guilty of animal cruelty. T.C.A. § 39-14-202(a)(2).

-22-

"Intentional" means that a person acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result;

. . .

"Knowing" means that a person acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result[.]

§ 39-11-106(a)(20), (22) (2018) (subsequently amended).

Viewed in the light most favorable to the State, the evidence shows that the Defendant entered into an agreement with Mr. Prather to board Mr. Prather's horses on the Defendant's rental farm. The Defendant held himself out to the Prathers as a horse trainer and as a person who was knowledgeable about horses. The agreement called for the Defendant to train, feed, water, and take care of the horses in exchange for $150 per horse, per month. Mr. Prather said that pursuant to the agreement, the Defendant was to provide grain and hay for the horses and that Mr. Prather eventually took oats, money for hay, and deworming medication to the Defendant, despite the Defendant's obligation to provide these things, because Mr. Prather became aware that the horses needed them. Ms. Prather said that at the time the horse went to the Defendant's rental farm, they were "fat" and "looked great."

With respect to the horse that Detective Willett shot after conferring with Dr. Fuller, the evidence shows that the horse was confined to an area with ground that was bare and without grass, that bark had been eaten from trees, that other food was not present, and that very little horse feces was present. Dr. Fuller testified that horses would eat feces if they were not given adequate food. The horse was weak, unable to stand, and had pawed a circle with its hooves in unsuccessful attempts to stand. Because the horse could not stand, it could not access water from the small stream that was in the area. The Defendant had been advised by Dr. Fuller to suspend the horse with farm equipment in order to prevent death, but the Defendant took no action to do so. Photograph exhibits showed the horse to be emaciated, and Mr. Hodges said the horse had a body condition score of one out of nine. Dr. Fuller testified that a horse in this condition would be in pain. Dr. Fuller said that when he examined the horse the day before its death, it had muscle atrophy, which was unusual in a young horse and which developed over time. In Dr. Fuller's opinion, the Defendant had sufficient knowledge to understand that the horse was "lacking." Dr. Fuller said the horse's death could have been avoided. When shown a July 31, 2017 photograph of the

horse that did not survive, Mr. Prather said the horse had not been in the same condition when it left his farm to go to into the Defendant's care.

Dr. Fuller testified that when he treated the injured horse in the spring of 2017, he glanced at Mr. Prather's other horses, which he said "looked okay." Relative to his visit to the Defendant's rental farm to treat the downed horse on July 30, 2017, Dr. Fuller said the Defendant's horses were in good condition but that Mr. Prather's horses had been neglected and had not been cared for properly. Dr. Fuller said he treated Mr. Prather's surviving horses after they returned to Mr. Prather's farm and that initially, they were thin with a body condition of three out of nine but that they steadily improved after being given "better feed." Mr. Hodges estimated the body condition score of the three surviving horses at "one and one half and two" and said thoroughbred horses should have a body condition score of four and one-half to five. Dr. Fuller and Mr. Hodges said that young horses such as Mr. Prather's horses needed dietary supplementation for proper growth and development, in addition to grass, and that oats alone were insufficient as supplemental feed. Mr. Hodges testified that the area where the downed horse was found appeared to have had additional horses confined for some period of time because of the presence of fencing on three sides, the presence of downed fencing, and the poor condition of the ground for providing adequate grass for horse feeding.

Mr. Prather testified that when he became concerned about the horses' poor physical conditions, the Defendant demanded payment before allowing Mr. Prather to retrieve the horses. Mr. and Ms. Prather testified that the Defendant was evasive about allowing Mr. Prather to retrieve the horses that were capable of being transported. When Mr. Prather was allowed to retrieve the horses on July 30, 2017, they were confined to a pen without water, hay, or grass. Mr. Prather said that the downed horse lay in a field, that he and the people assisting him in transporting the horses tried to get the horse to stand, and that he told the Defendant to get the horse up. Mr. Prather said that he, not the Defendant, called Dr. Fuller to attend to the downed horse on July 30. Mr. Prather said it took about nine months to return the three surviving horses, who had been malnourished, to good health.

The Defendant testified that he checked on the horses once or twice a day when they were boarded with him at his rental farm. The photograph exhibits depicting the horses show that their poor physical health was apparent and would have been obvious to the Defendant.

From this evidence, a rational jury could conclude that the Defendant knowingly or intentionally failed to provide reasonable food, water, or care to the horses. The horses were entrusted to the Defendant's custody and care, during which time they became malnourished, with low body condition scores. The Defendant unreasonably failed to provided adequate access to pasture, confined them in locations on the farm that lacked food and water, failed to feed them the appropriate diet in adequate portions, and failed to

seek veterinary or other expert advice when the horses' malnourishment became pronounced. In the case of the downed horse, the Defendant failed to obtain veterinary care and failed to follow veterinary advice once Mr. Prather called Dr. Fuller to attend to the horse. When Mr. Prather became concerned about the horses' welfare, the Defendant demanded payment and was evasive about allowing Mr. Prather to retrieve them, demonstrating that the Defendant was not, as he argues, acting merely recklessly or negligently. The evidence is sufficient to support each of the Defendant's convictions of animal cruelty.

The Defendant has noted in his brief that the animal cruelty statute provides a defense for an individual who is engaged in "accepted veterinary practices, medical treatment . . . , or bona fide experimentation for medical research" or who engages "in usual and customary practices which are accepted by college of agriculture or veterinary medicine with respect to [an] animal." T.C.A. § 39-14-202(c), (f)(1). The record contains no evidence that these provisions applied to the Defendant's conduct. He is not entitled to relief on this basis.

### III

### Denial of Judicial Diversion, Sentencing, and Imposition of Fines and Restitution

The Defendant contends that the trial court erred in denying his request for judicial diversion, in imposing a sentence involving confinement, and in imposing fines and ordering restitution without considering his financial resources and future ability to pay. The State counters that the court did not abuse its discretion in denying diversion, sentencing the Defendant to split confinement, and imposing $13,000 in fines and restitution.

At the sentencing hearing, Mr. Prather testified that the value of the horse that did not survive was around $25,000. He said the surviving horses took one year to return to "normal." He said he provided monthly veterinary care for them, which cost about $2500 to $2700. He said they required a specialized dietary plan due to the condition they had been in when he retrieved them from the Defendant's custody. He said that the surviving horses were now in good health and that two of them were in Louisiana to begin racing careers. Mr. Prather said that as he left the Defendant's rental farm with the three surviving horses, the Defendant stated, "I did the best I could." Mr. Prather agreed that he paid the Defendant $600 per month for four months to board the horses.

Mr. Hodges testified that the present case was the only animal cruelty case in which he had been involved in which the animals were in the custody of a boarding agent, rather than the owner. He said he would expect a person such as the Defendant to be held to a

"higher standard." Mr. Hodges agreed this case was the only one in which he had dealt with thoroughbred horses, although he said he was familiar with quarter horses.

Linda Evans testified for the defense that the Defendant had worked for her as a horse trainer. She said she learned about him when she heard about his animal rescue operation and heard about horses with which he had worked previously. She said that the Defendant was good with animals and that he successfully trained her horse. She described the Defendant as honest and trustworthy. She said the Defendant was a devoted father. She said that she trusted the Defendant with her horse, notwithstanding his convictions in the present case. She said the Defendant had mistakenly believed that Mr. Prather had been investigated for the condition of Mr. Prather's horses at the time the Defendant began boarding them but that the Defendant had been the target of the investigation. She said that at the time the Defendant held the mistaken belief, he did not speak poorly of Mr. Prather.

Lauren Gruber testified that she was a hoof-care practitioner of twenty years. She said the Defendant apprenticed with her. She described him as a "one of the most decent men" she had ever met. She said the Defendant was trusting and worked hard to learn. She said that she rehabilitated horses on her farm for $600 per horse, per month and that "it takes a lot of resource to get a horse into good shape and take good care" and that she wished she and the Defendant had discussed this more. She said she had horse owners come to her farm monthly to see their horses in order to avoid "problems . . . going forward." She said she rehabilitated "regular people's horses," not thoroughbreds. She said the Defendant was good at trimming hooves of horses with behavioral issues and that she thought he deserved a second chance relative to the present case.

Two letters of recommendation relative to the Defendant were received as exhibits. The presentence report, which consisted solely of a summary of the Defendant's prior criminal charges and convictions, was received as an exhibit. It reflected three prior convictions of speeding.

In his allocution, the Defendant quoted Biblical scripture and said he accepted the jury's verdicts. He said that he had been honorably discharged from the Air Force, that he had worked as a stockbroker and insurance broker, and that he had owned other businesses. He said he had a heart attack and had to declare bankruptcy. He said he had been in an abusive marriage and had to divorce his wife. He said he became religious and began working with horses. He said he started a horse rescue operation. Regarding Mr. Prather's horses, the Defendant stated he had wanted to ease their suffering and had believed they would become healthy "with an abundance of fresh pasture and proper foot care." He said he had "no intent or malice" to withhold care from Mr. Prather's horses and that he worked with them daily within the level of his skill and experience. He said he provided food, water, and shelter. He said he mixed a nutritional supplement with oats he fed them,

provided a salt mineral block, and treated their "ring rot" daily. He said he spoke with a veterinarian by telephone and followed the veterinarian's instructions, applying medicine to the horses twice daily. He said he trimmed the horses' hooves and treated the horses for parasites. The Defendant said that due to Mr. Prather's financial circumstances, the Defendant did not bill Mr. Prather for over $1000 of training that the Defendant provided. The Defendant said, "[D]ue to my lack of experience with the devastating effects of parasites, I was slow to recognize the signs." He said he had only dealt with horses which had been dewormed regularly before he was involved in the care of Mr. Prather's horses.

The Defendant stated that after Mr. Prather became concerned about the horses' weights upon seeing photographs on June 22, 2017, the Defendant followed Mr. Prather's instructions to "double the daily oats." The Defendant said that he "followed [Mr. Prather's] lead" in not calling a veterinarian and that he did not learn until four days later that the horses had parasite infestations. The Defendant said that he sent Mr. Prather a text message on June 22, 2017, in which he said, "Maybe it's best you keep the horses at your place," but that Mr. Prather did not want to retrieve the horses until the Defendant notified Mr. Prather over three weeks later that the monthly boarding rate would be increased.

The Defendant stated that he thought "the standard for care was firmly established" on July 9, 2017, after Dr. Fuller inquired about the horses' weight losses but did not examine, diagnose, or treat weight loss. The Defendant said Dr. Fuller commented a week later that the horses had gained weight and looked better. The Defendant said he trusted Dr. Fuller's professional opinion.

The Defendant testified that he was a different man than he had been two years earlier and that he had gained experience and learned. He said he wished he "could have saved all of them." The Defendant asked the trial court to consider his children, particularly his son. The Defendant said his son was emotionally dependent upon him due to their having previously been in an abusive home. The Defendant also asked the court to consider his finances. The Defendant said that his 2017 income had been $8800 and that his 2018 income had been $14,000. He said that due to his needing money to post bond, he had borrowed an unspecified amount of money in order to make a mortgage payment. He said he had been "on food stamps" during the pendency of the case, that he drove a twelve-year-old car, that his family bought their clothing at thrift stores, and that he did not have a smart phone or cable television service. He said it was difficult to find work as a horse trainer due to the facts of the present case but that he had a few clients who knew he would never intentionally hurt an animal. He said his family had fourteen animals, including a dog, as well as chickens, goats, and horses, for whom he was the sole caretaker.

The trial court denied judicial diversion, imposed split-confinement sentences of eleven months, twenty-nine days for each of the four convictions, consisting of ninety days

in jail followed by probation. The court ordered that the sentences be served concurrently. The court also imposed restitution of $6000 and fines of $7000.

## A. Denial of Judicial Diversion

We begin our review with the Defendant's argument that the trial court erred in denying his request for judicial diversion. A trial court may order judicial diversion for certain qualified defendants who are found guilty of or plead guilty or nolo contendere to a Class C, D, or E felony or a lesser crime; have not previously been convicted of a felony or a Class A misdemeanor; and are not seeking deferral for a sexual offense. *See* T.C.A. § 40-35-313(a)(1)(B)(i) (Supp. 2017) (subsequently amended). The grant or denial of judicial diversion is within the discretion of the trial court. *State v. King*, 432 S.W.3d 316, 323 (Tenn. 2014) (citing T.C.A. § 40-35-313(a)(1)(A)). When considering whether to grant judicial diversion, a trial court must consider (1) the defendant's amenability to correction, (2) the circumstances of the offense, (3) the defendant's criminal record, (4) the defendant's social history, (5) the defendant's physical and mental health, (6) the deterrence value to the defendant and others, and (7) whether judicial diversion will serve the ends of justice. *State v. Electroplating, Inc.*, 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998); *State v. Parker*, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996); *see King*, 432 S.W.3d at 326 (stating that recent caselaw affecting the standard of review for sentencing determinations "did not abrogate the requirements set forth in *Parker* and *Electroplating*, which are essential considerations for judicial diversion"). "The record must reflect that the court has weighed all of the factors in reaching its determination." *Electroplating*, 990 S.W.2d at 229. If a trial court refuses to grant judicial diversion, "[T]he court should clearly articulate and place in the record the specific reasons for its determinations." *Parker*, 932 S.W.2d at 958-59. "The truthfulness of a defendant, or lack thereof, is a permissible factor for a trial judge to consider in ruling on a petition for suspended sentence." *State v. Neeley*, 678 S.W.2d 48, 49 (Tenn. 1984).

On review of a decision to grant or deny judicial diversion, this court will apply a presumption of reasonableness if the record reflects that the trial court considered the *Parker* and *Electroplating* factors, specifically identified the relevant factors, and placed on the record the reasons for granting or denying judicial diversion, provided any substantial evidence exists to support the court's decision. *King*, 432 S.W.3d at 327. If, however, the trial court failed to weigh and consider the relevant factors, this court may conduct a de novo review or remand the case for reconsideration. *Id*. at 328.

Likewise, a trial court's reliance upon an irrelevant factor may result in an abuse of discretion. *See State v. McKim*, 215 S.W.3d 781, 787 (Tenn. 2007). However, a court's mere consideration of an irrelevant factor does not result in an abuse of discretion because "it is the undue consideration of an irrelevant factor that is prohibited." *Stanton v. State*, 395 S.W.3d 676, 687 n.2, 691 (Tenn. 2013). A "trial court is not required to recite on the

record all of the . . . factors; however, the record should reflect that the trial court considered all of the factors in rendering its decision that it 'identified the specific factors applicable to the case before it.'" *State v. Dycus*, 456 S.W.3d 918, 930 (Tenn. 2015) (quoting *King*, 432 S.W.3d at 327.).

In denying diversion, the court stated the following:

> . . . I'm going to look at the judicial diversion factors from *Parker* and *Electroplating*. Number (1), the accused, amenability to correction. I do find that the accused is amenable to correction. There's really nothing that's been presented that would indicate that he's not amenable to correction. So I find that factors weighs in favor of granting judicial diversion.
>
> The circumstances of the offense are horrible. You couldn't have [a] much more horrible set of circumstances [f]or an offense. You're paid to take care of somebody's animals and yes, it might very well be true that the owner should have taken a more active role in looking after his animals.
>
> Certainly if I had some thoroughbred racing horses that I'd invested and thought were worth thousands of dollars, I'd kind of look at it like I do my stocks and bonds, I'd kind of keep a track on what's going on with that, but nonetheless, he paid you to take care of them.
>
> And obviously, the photographs, I mean we've got some of that information right here that we can go through, but they're still clear in my mind. Particularly with the young horse laying down there on its side, bones all showing everywhere, so weak it can't even get up. I mean, just – and then we had three others, one of which that I could look at from the photograph and tell that horse was just a short way away from dying. And then the others were a little bit better.
>
> And I'm going to credit Mr. Hodges' testimony with respect to the conditioning. I find Dr. Fuller's assessment of the horses to be extremely favorable to you and not in accordance with the evidence I saw. I think Mr. Hodges was much more realistic in his assessment of the condition of the horses. So I find the circumstances of the offense weigh heavily against granting judicial diversion.
>
> The accused's criminal record, you don't have a criminal record as far as I'm concerned. I don't count speeding to be some serious violation worth even considering for purposes of denying a judicial diversion. So I find your

accused criminal record would weigh in favor of granting you a judicial diversion.

The accused's social history seems to be pretty good. You've served in the military. Nobody's contradicted that. You've had some business experience, had a heat and air conditioning business that I have seen some evidence of.

You testified about being a stockbroker and various different things that you have done. So I think your social history is also what I would consider favorable and I would find that that would weigh in favor of granting a judicial diversion.

The accused's physical and mental health. That one to me is always an interesting one to consider with respect to judicial diversion. You appear to be in decent physical health to me. You trim horses' hooves and do things of that nature, so I presume – you know, you said you had a heart attack. I don't know, does having a heart attack make you more or less likely a good candidate for diversion? I have never really understood that one. But anyway, you seem in good physical shape, so I guess that's favorable. Certainly if you weren't, I wouldn't find it unfavorable. But anyway, I think that's favorable.

The mental health aspect of that, here again, nothing really – concerning your mental health sufficient to me to make a finding one way or the other, but I just find that factor . . . just doesn't weigh against granting you a judicial diversion. I'm not going to give it much credit in weighing in favor of one either, but it's not negative toward you.

We'll come down to . . . "The deterrence value to the accused as well as others." That's an interesting one because [defense counsel] . . . attempted to distinguish this situation from other and used the testimony of Mr. Hodges to say that [he had] never seen this situation before, so shouldn't need to deter others because it's just not happening, you know, just not happening.

Well, I think it extends far greater than that, but also, if it didn't – which it does, and I find that it does – you still need to be deterred.

And of course [defense counsel] would indicate – try to say that you have learned from it and that this would never happen again and all those various things that he argued, and of course in your allocution you alluded to.

But I find the deterrence value to you as well as to others, we absolutely don't need to segment out a small section of animal cruelty and say this is specialized animal cruelty so since that don't happen [sic], we don't need to worry about it because it's just not happening.

Animal cruelty in general needs to be stamped out. So with respect to that I find that both the deterrence value to use as an individual as well as the others weighs heavily against granting you a judicial diversion.

And then . . . whether "Judicial diversion will serve the interest of the public as well as the accused." Well, there's no question it would serve your interest. I mean . . . that's pretty obvious. As you said, if you could get this off – you didn't say it this way, I'm adding a little bit to it, but if you could get this off your record then that would certainly make you much more employable in this business. There's no question about that.

So obviously if I granted a judicial diversion, that would serve your interest. The question is whether that serves the interest of the public, and the Court finds that it does not serve the interest of the public to grant you a judicial diversion.

So when I weigh all the factors out and consider all the factors, I decline to grant you a judicial diversion. I find you're not qualified . . . under the analysis that I'm required to perform under *Parker* and *Electroplating*. So your request for judicial diversion is denied.

On appeal, the Defendant acknowledges that the trial court considered the *Parker* and *Electroplating* factors but argues that the court abused its discretion in denying diversion. He argues that the court weighed the majority of the factors in his favor, and he invites this court to reweigh the factors on the basis that the evidence does not support the court's findings that the circumstances of the offense, the need for deterrence, and the interests of the public weighed against a grant of diversion.

With regard to the Defendant's argument that the trial court weighed the majority of factors in his favor but nevertheless denied judicial diversion, we note that the court is charged with weighing the factors against each other and in explaining its ruling on the record. *See King*, 432 S.W.3d at 326; *Electroplating*, 990 S.W.2d at 229. A mere numerical tally of the competing factors is not contemplated.

The Defendant argues that the circumstances of the offense do not weigh against a grant of diversion because the circumstances are not more egregious than those

-31-

contemplated by the elements of the offense. To the contrary, the trial court noted the emaciated state of the horses, the fact that the deceased horse was so weak before its death that it was unable to stand, and that one of the surviving horses was in almost as poor condition as the one which did not survive. The court found that Dr. Fuller's testimony regarding the horses' conditions were not credible and instead credited Mr. Hodges' testimony regarding the horses' poor body conditions.

The Defendant also argues that the trial court found a need for general deterrence without finding that similar crimes were being committed in the community and that denying diversion would rationally deter others from committing similar crimes. *See State v. Hooper*, 29 S.W.3d 1, 10 (Tenn. 2000) (holding that a trial court may not deny an alternative sentence solely upon the basis of deterrence without findings that deterrence is needed in the community, jurisdiction, or state, and that incarceration of the defendant rationally serves to deter others from committing similar crimes); *see also State v. Trotter*, 201 S.W.3d 651, 654 (Tenn. 2006). We note, first, that the court found that the need for both specific deterrence of the Defendant, as well as general deterrence of the public, weighed against the grant of diversion. More significantly, the court did not deny diversion based solely upon the need for deterrence. *See State v. Shapanya*, 516 S.W.3d 473, 476 (Tenn. 2014) (holding that the heightened standard of *Hooper* and *Trotter* apply only when the need for deterrence is the sole basis for a denial of probation).

With regard to the question of whether the interests of the public are served by a grant of diversion, the Defendant argues that this factor is applicable "when the defendant is a person who violates a position of public trust, such as public officials and members of the criminal justice system, including law enforcement officers." In support of this proposition, the Defendant cites *State v. Houston*, 900 S.W.2d 712, 715 (Tenn. Crim. App. 1995). However, *Houston* does not stand for this proposition. The defendant in *Houston* was a police officer who unsuccessfully sought pretrial diversion for an assault charge related to on-duty conduct involving a court officer. *Id.*, 900 S.W.2d at 713, 715. The district attorney denied diversion, in part, on the basis that the defendant, an officer within the police department, violated a position of public trust in committing the offense, and this court held that the violation of a public trust was an appropriate consideration in weighing the ends of justice and the best interests of the public against a grant of diversion. *Id.* at 715. Nothing in *Houston* stands for the proposition that the interests of the public factor may be weighed against a defendant *only* if a violation of public trust is involved. *See generally id.*

The record reflects that the trial court considered the appropriate factors and the facts of the case. The court conducted a thorough evaluation and made findings of fact with respect to each factor and noted the relative weight it assigned to each. The court's findings are supported by the record. Upon review, we conclude that the Defendant has not shown an abuse of discretion. The court did not err in denying judicial diversion.

## B. Imposition of Split Confinement

The Defendant argues that the trial court erred in imposing split confinement, rather than full probation. Tennessee Code Annotated 40-35-302(b) (2019) governs misdemeanor sentencing, which requires a trial court to impose a specific sentence consistent with the purposes and principles of the Sentencing Act. Likewise, if a trial court orders a defendant to serve a sentence in confinement, the court must fix a percentage of the sentence a defendant is required to serve. *Id.* § 40-35-302(d). Although a trial court is not required to hold a sentencing hearing, the court must permit the parties to address "the length of any sentence and the manner in which the sentence is to be served." *Id.* § 40-35-302(a). Trial courts are granted considerable discretion and flexibility in misdemeanor sentencing determinations, and defendants convicted of misdemeanors are not presumed eligible for alternative sentencing. *State v. Troutman*, 979 S.W.2d 271, 273 (Tenn. 1998); *see State v. Combs*, 945 S.W.2d 770, 773-74 (Tenn. Crim. App. 1996); *see also State v. Williams*, 914 S.W.2d 940, 949 (Tenn. Crim. App. 1995). Likewise, "there is no presumptive minimum sentence provided by law for misdemeanors." *State v. Seaton*, 914 S.W.2d 129, 133 (Tenn. Crim. App. 1995). In determining the percentage of service for misdemeanors, a trial court must consider the purposes and principles of sentencing and the enhancement and mitigating factors and must not impose arbitrary incarceration. T.C.A. § 40-35-302(d); *see Troutman*, 979 S.W.2d at 274 (stating that "while the better practice is to make findings on the record when fixing a percentage of a . . . sentence to be served in incarceration, a . . . court need only consider the principles of sentencing and enhancement and mitigating factors . . . to comply with the legislative mandates of the misdemeanor sentencing statute").

This court reviews challenges to sentences imposed for felony offenses relative to the manner of service within an appropriate sentence range "under an abuse of discretion standard with a 'presumption of reasonableness.'" *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). The same standard of review applies to questions related to probation or any other alternative sentence. *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012). Although our supreme court has not considered whether the abuse of discretion with a presumption of reasonableness standard applies to misdemeanor sentencing determinations, it has stated that the standard "applies to all sentencing decisions," and this court has previously applied the standard to misdemeanor sentencing. *King*, 432 S.W.3d at 324; *see State v. Sue Ann Christopher*, No. E2012-01090-CCA-R3-CD, 2013 WL 1088341, at *6-8 (Tenn. Crim. App. Mar. 14, 2013), *perm. app. denied* (Tenn. June 18, 2013); *see also* T.C.A. § 40-35-401(d) (2019) (stating that all sentencing issues raised pursuant to Code section 40-35-401(a) are subject to the same standard of review).

Generally, compliance with the purposes and principles of sentencing requires a trial court to consider any evidence received at the trial and sentencing hearing, the presentence

-33-

report, counsel's arguments as to sentencing alternatives, the nature and characteristics of the criminal conduct, any mitigating or statutory enhancement factors, statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee, any statement that the defendant made on his own behalf, and the potential for rehabilitation or treatment. *State v. Ashby*, 823 S.W.2d 166, 168 (Tenn. 1991); *see* T.C.A. §§ 40-35-103 (2014), -210 (2019); *see also* T.C.A. § 40-35-102 (2019).

In sentencing the Defendant, the trial court found that two statutory enhancement factors applied. Noting that Mr. Prather had been deprived of a valuable thoroughbred racehorse which had been entrusted to the Defendant's care, the court found that the property damage had been particularly great. *See* T.C.A. § 40-35-114(6) (2019). The court found that the Defendant abused a position of private trust, noting that he gained Mr. Prather's trust. *See id.* at (14). The court observed that the Defendant claimed to operate a horse rescue, that Mr. Prather regarded the Defendant as a "horse whisperer" at a time Mr. Prather was overwhelmed with work and family obligations, that Dr. Fuller found a small horse pen marked with tape when he came to examine the now-deceased horse, and that the Defendant's horses had been healthy despite the poor condition of Mr. Prather's horses. The court found that no mitigating factors applied. *See id.* § 40-35-113 (2019).

In determining the manner of service of the sentence, the trial court relied heavily on the circumstances of the offense. The court noted that although the Defendant may have lacked the requisite experience to board horses, the Defendant nevertheless took in Mr. Prather's horses and did not take "personal responsibility" when the horses' conditions declined. The court said that even if it credited the Defendant's account of having given the horses deworming medication, the Defendant should have sought outside help when the horses' conditions continued to decline. The court noted, as well, that even by the Defendant's own account, the Defendant kept Mr. Prather's horses confined to a pen without adequate food or water for four or five days in July, despite the horses' conditions already being poor. The court said that the Defendant should not have taken on the care of Mr. Prather's horses if he had not been in a financial position to fulfill the obligation. The court again noted the difference in the condition of the Defendant's horses and Mr. Prather's horses. The court observed that the Defendant had not contacted Mr. Prather to notify him that the Defendant was no longer financially able to board the horses. The court order the Defendant to serve ninety days of the eleven month, twenty-nine-day sentences, with the balance on probation.

We begin our analysis by noting that the trial court, though not required by the sentencing statute, made detailed findings regarding its rationale for sentencing the Defendant. The parties were afforded the opportunity to be heard on the issue of sentencing, and the court considered the relevant principles, factors, and circumstances. The Defendant enjoyed no presumption in favor of probation. *See Troutman*, 979 S.W.2d

at 273. We presume that the court's determination was reasonable, and upon review, we conclude that the Defendant has not shown that the court abused its discretion in imposing split confinement.

In reaching this conclusion, we have considered the Defendant's argument that the trial court relied on the need for deterrence in imposing confinement without finding that evidence existed regarding a need for deterrence. As we have stated, the court relied heavily upon the circumstances of the offense, and particularly upon the Defendant's conduct in failing to take responsibility for the horses' welfare and to seek help once the situation deteriorated, after having gained Mr. Prather's trust and having agreed to enter into a business relationship with Mr. Prather for boarding the horses. The Defendant is not entitled to relief on this basis.

## C. Fines and Restitution

Finally, the Defendant argues that the trial court abused its discretion in ordering fines and restitution, in "rotely" imposing the fines set by the jury without conducting an independent review and, as to restitution, without considering the Defendant's financial resources and future ability to pay.

At the sentencing hearing, the trial court noted that the jury imposed the maximum fine of $2500 for the conviction related to the deceased horse. The court observed, "That tells me something. I think that speaks volumes." The court imposed a $2500 fine for this conviction. With respect to the remaining counts, the court observed that the jury had not imposed the maximum fine, instead choosing to set the fine at $1500 for each count. Before imposing a $1500 for each of the three additional counts, the court noted that the remaining horses survived and surmised that the jury "didn't like" the facts.

With regard to restitution, the trial court said the following:

> I do find . . . restitution in the amount of $25,000; however, I'm required out of the statute to analyze your ability to pay. I don't find that you have the ability to pay that. If the owners wants [sic] to seek a civil judgment against you and then try – if you strike it rich or something – collect, that's fine.

> But I'm going to order you to pay restitution [in the] amount [of] $6,000 and that will be required to be paid during the course and term of your probation, which if you factor that out that's $500 a month and that's the most I think you have the ability to pay.

-35-

If the criminal statute permits a fine of more than $50, the jury shall fix the fine, if any. T.C.A. § 40-35-301(b) (2019). Our supreme court has said that fines imposed as part of a criminal sentence are to be reviewed in the same manner as other aspects of the sentence. *See State v. Taylor*, 70 S.W.3d 717, 722-23 (Tenn. 2002); *State v. Bryant*, 805 S.W.2d 762, 765-66 (Tenn. 1991). A defendant's financial condition and earning ability are relevant to the inquiry, as are a defendant's "prior history, potential for rehabilitation, financial means, and mitigating and enhancing factors that are relevant to an appropriate, overall sentence." *Taylor*, 70 S.W.3d at 723.

A defendant convicted of a felony or misdemeanor may be ordered to pay restitution to the victim or victims in conjunction with a sentence of continuous confinement in a local jail, workhouse, or department of correction. T.C.A. § 40-35-104(a), (c)(2), (6), (8) (2019); *see id.* § 40-35-304(a) (2019). The amount is determined based on "the nature and amount of the victim's pecuniary loss." *Id.* § 40-35-304(b). "Pecuniary loss," in the context of this section, means "[a]ll special damages . . . as substantiated by evidence in the record or as agreed to by the defendant" and "[r]easonable out-of-pocket expenses incurred by the victim resulting from the filing of charges or cooperating in the investigation and prosecution of the offense[.]" *Id.* § 40-35-304(e)(1)-(2). At the time of the sentencing hearing, the court shall specify "the amount and time of payment . . . to the victim and may permit payment . . . in installments." *Id.* § 40-35-304(c). The court may not establish a payment "schedule extending beyond the statutory maximum term of probation supervision that would have been imposed for the offense. *Id.* § 40-35-304(c). "The court shall consider the financial resources and future ability of the defendant to pay" in determining restitution. *Id.* § 40-35-304(d). Moreover, "upon expiration of the time of payment or the payment schedule imposed . . . , if any portion of restitution remains unpaid, then the victim or the victim's beneficiary may convert the unpaid balance into a civil judgment[.]" *Id.* § 40-35-304(h)(1).

The record reflects that the trial court considered the appropriate fines for the offenses and concurred in the jury's assessment of the correct amounts. The record likewise reflects that the court determined the pecuniary loss to Mr. Prather to be $25,000, the value of the horse Mr. Prather provided in his testimony at the sentencing hearing, and that the court further considered the Defendant's financial resources and future ability to pay in setting restitution at the lower amount of $6,000. The court further considered the Defendant's ability to pay when it ordered the Defendant to pay $500 per month during the probationary period of his sentence. The Defendant, an Air Force veteran, stated at the sentencing hearing that he had worked as a stockbroker and insurance broker and had owned other businesses. He testified at the trial that he received a monthly veteran's disability stipend, although its amount is not specified in the appellate record. Although he stated that he had a heart attack and later encountered financial difficulties which caused him to declare bankruptcy, the record reflects that the Defendant has prior work experience in a number of industries in addition to the employment as a farrier in which he was

-36-

engaged at the time of sentencing. No evidence shows that he lacks the future ability to pay the fines and restitution imposed by the trial court. The Defendant's statement to the court regarding his having borrowed money to make one mortgage payment shows that he is a homeowner. In addition, he stated that he owned numerous animals, some of which were livestock. We conclude that the court conducted the proper inquiry and that the Defendant has not shown an abuse of discretion.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE